# In the United States Court of Federal Claims

Nos. 18-1964L & 19-1375L
(Consolidated)
(Filed: December 3, 2021)
(Nunc Pro Tunc: March 23, 2021)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| ROBERT PRESSLY and JANE PRESSLY et al., | \* |
| | \*  Trails Act; Indiana Law; Property Interest |
| | \*  Conveyed via Release Executed Pursuant |
| Plaintiffs, | \*  to Railroad Company's Legislative Charter; |
| | \*  Fee Simple Versus Easement; Cross- |
| v. | \*  Motions for Summary Judgment; Request to |
| | \*  Certify Questions to the Indiana Supreme |
| THE UNITED STATES, | \*  Court; Indiana Supreme Court's Adherence |
| | \*  to Its Prior Rulings |
| Defendant. | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Steven M. Wald, St. Louis, MO, for plaintiffs.

Brian R. Herman, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

Plaintiffs in this case, along with plaintiffs in five other cases before the undersigned, own real property adjacent to a railroad line in Marion and Hamilton Counties, Indiana.[1]  They contend that the United States violated the Fifth Amendment to the United States Constitution by authorizing the conversion of the railroad line into a recreational trail pursuant to the National Trail Systems Act ("Trails Act"), thus acquiring their property by inverse condemnation.  Four of the cases, including this one, are proceeding in a coordinated manner,[2] and a subset of plaintiffs from these cases ("Group 2 plaintiffs") assert claims that require the resolution of a single dispositive legal issue:  whether a particular instrument by which the railroad company acquired

---

[1]  The six cases are Oldham v. United States, No. 18-1961L (consolidated with Overlook At The Fairgrounds LP v. United States, No. 18-1962L); Pressly v United States, No. 18-1964L (consolidated with Jones v. United States, No. 19-1375L); Bradley v. United States, No. 19-400L; ATS Ford Drive Investment, LLC v. United States, No. 19-471L ("ATS Ford"); Episcopal Diocese of Indianapolis v. United States, No. 19-881L (consolidated with Doyle v. United States, No. 19-882L); and ID Castings, LLC v. United States, No. 19-1158L.

[2]  The four cases are Oldham, Pressly, Bradley, and ATS Ford.

the portion of the railroad corridor adjacent to their parcels conveyed an easement or a fee simple estate.  The parties filed nearly identical cross-motions for summary judgment in each case.  As explained in more detail below, the court denies plaintiffs' motion and grants in part defendant's motion.

# I. BACKGROUND

On January 19, 1846, the Indiana General Assembly enacted an "Act to incorporate the Peru and Indianapolis Railroad Company."[3]  Pursuant to that legislative charter, the Peru and Indianapolis Railroad Company ("PIRC") was authorized to construct a railroad line within Indiana originating in the town of Peru, running through the towns of Kokomo and Noblesville, and terminating in Indianapolis.  The legislative charter provided that the railroad corridor was to be no more than eighty feet wide, and could be acquired using a number of mechanisms:

> Sec. 15.  It shall be lawful for the corporation, either before or after the location of any section of the Road, to obtain from the persons through whose land the same may pass, a relinquishment of so much of the land as may be necessary for the construction and location of the road; as also, the stone, gravel and timber, and other materials that may be obtained on the said route, and may contract for stone, gravel, timber, and other materials that may be obtained from any land near thereto:  and it shall be lawful for said corporation to receive by donations, gifts, grants, or bequests, land, money, labor, property, stone, gravel, wood, or other materials, for the benefit of said corporation . . . .

> Sec. 16.  That in all cases where any person through whose land the road may run, shall refuse to relinquish the same, or when a contract by the parties cannot be made, it shall be lawful for the corporation to [initiate condemnation proceedings].

> . . . .

> Sec. 18.  That if it shall be found necessary and advantageous to the location and construction of said road, the corporation shall have the right to lay the same along and upon any county or State road:  <u>Provided however</u>, That before such location is made, the corporation shall make application to the county commissioners of the proper county, for such right; and said commissioners are hereby vested with power to grant the same, by an order entered upon their records:  <u>And provided also</u>, That such right shall be granted on condition that the corporation shall leave a sufficiency of said State or county road in as good repair, for common use, as previous to such occupation.

Further, with respect to the PIRC's acquisition of the railroad corridor, the charter provided (footnote added):

---

[3]  The facts in this section are derived from the exhibits attached to the parties' summary judgment briefing and are not in dispute.

Sec. 19.  That when said corporation shall have procured the right of way, as herein before provided, they shall be seized, in fee simple, of the right to such land, and they shall have the sole use and occupancy of the same, but not to interfere with the right of way of any Railroad company heretofore incorporated;[4] and no person, body politic or corporate, shall in any way interfere with, molest, disturb or injure any of the rights or privileges hereby granted, or that would be calculated to detract from or affect the profits of said corporation.

In accordance with its legislative charter, the PIRC acquired the portions of the railroad corridor at issue in this case in the 1840s (primarily in 1848) and early 1850s (either in 1851 or 1853).  Frequently, its acquisitions were accomplished using recorded instruments that will be referred to generally as "releases."  All but two of the releases in the record before the court include identical preprinted language:[5]

I, _____ of the county of _____ and State of Indiana, for, and in consideration of the advantages which can or will result to the public in general, and myself in particular, by the construction of the "PERU AND INDIANAPOLIS RAILROAD," as now is, or may hereafter be, surveyed, or finally located, and for the purpose of facilitating the construction and completion of said work, do hereby, and for myself, my heirs, executors, administrators and assigns, RELEASE and RELINQUISH to the "PERU AND INDIANAPOLIS RAILROAD COMPANY" the right of way for so much of said road as may pass through or cut the following piece, parcel or lot of land, to wit: _____

And I do further release and relinquish to the said PERU AND INDIANAPOLIS RAILROAD COMPANY all DAMAGES and right to DAMAGES which I might sustain or be entitled to, by reason of anything connected with or consequent upon the construction of said road or the repairing thereof.

Moreover, most of these releases include a third preprinted paragraph:

And I do [license] and permit said Company, or any authorized agent of

---

[4]  In the mid-nineteenth century, the Indiana General Assembly, drafters of real estate conveyance instruments, and Indiana courts regularly used plural pronouns and verbs in conjunction with collective nouns such as "corporation" and "company."  Although not preferred in modern American English, this usage is common in British English, and was common in American English in the years following the American Revolution.  See Bryan A. Garner, A Dictionary of Modern Legal Usage 170-71 (2d ed. 1995) (defining "collective nouns").  Due to its prevalence, the court does not disturb this usage when quoting the PIRC's legislative charter, the conveyance instruments executed by the PIRC, and Indiana case law.

[5]  On some of the releases, minor handwritten additions and deletions were made to the preprinted language.  Those alterations do not affect the construction of the releases.

the same, to enter upon said land, and take therefrom any timber, stone, sand, gravel, earth or other materials for the construction and repairing of said road from time to time.

On all of the preprinted releases, a description of the "piece, parcel or lot of land" was handwritten at the end of the first paragraph. Two of these releases included additional handwritten language after the description. On the release executed by Silas McCole on March 9, 1853 ("McCole release") was this handwritten clause: "and do further relinquish all damage for earth taken out Side of the right of way and for earth put out Side the eighty feet or for using other earth or materials taken to construct the Peru & Indianapolis Rail Road across said land." And on the release executed by Richard Shelley in September 1848 ("Shelley release") was this handwritten clause:

> the above Relinquishment is given in consideration of the President & Directors of the Peru & Indianapolis Rail Road Company paying the undersigned Seventeen Dollars & fifty cents and the company further agree to dig two pits for the undersigned where he may designate for the use of his fences where . . . the same may cross.

The other two releases in the record before the court are entirely handwritten. The first was executed by Daniel Lovett ("Lovett release") and provided:

> This indenture made this Second day of Nov. AD 1848 between Daniel Lovett . . . and the Peru and Indianapolis Rail Road Company . . . , that the said Lovett for and in consideration of the advantages which can or will result to the public and to himself in particular by the construction of the Peru and Indianapolis Rail Road, as it is now located through the tract of land hereinafter described and for the purpose of facilitating the construction and completion of said work does hereby for himself and his heirs and assigns, release and relinquish to the Peru and Indianapolis Rail Road Company the right of way for so much of said Road as may pass through or cut the following piece parcel or lot of land, to wit, [description of land]. The foregoing grant and release is upon the following [agreement] and condition, to wit, the said Peru and Indianapolis Rail Road Company shall pay to the said Lovett for the land so taken and occupied by them at the rate of twenty dollars per acre, which in the wood land shall include the whole width from which it is necessary to cut off the wood and timber, and upon the residue of the land it shall include all that part occupied by the grade . . . and the fence enclosing the road. The said Rail Road Company agree to dig plank up and keep in repair pits at each and every place where any fence upon said tract of land now crosses the track of said Road or they may enclose the road with a good fence and keep the same in repair, and to pay for all the injury that may be done by means of said Road and the transportation of produce merchandise or passengers thereon, and by means of said pits to the live stock of any and all persons who may be occupants of the premises hereinbefore described before the said enclosing fences shall be constructed or while the same shall be out of repair. The said Rail Road Company agree to leave all of the apple trees uninjured which

-4-

may stand upon said premises outside of the grade of said Road.  The said Lovett reserves to himself his heirs and assigns all the wood and timber upon said premises standing or being within the survey of said Road, and the right to remove the same at all reasonable times.  Said Lovett also reserves the right to cross the track of said Road upon said premises with teams and loaded vehicles at all convenient times and places.  The said Rail Road Company agree to pay the said Lovett for the said release as follows, to wit, twenty five dollars by the first day of Nov. 1848, and the residue by the first day of February 1849.

The second was executed by Elijah James ("James release") and provided:

> This indenture made this Second day of Nov. AD 1848 between Elijah James . . . and the Peru and Indianapolis Rail Road Company . . . , that the said Elijah James . . . in consideration of the advantages which can or will result to the public in general and to himself . . . in particular by the construction of the Peru and Indianapolis Rail Road, as the same is now located, and for the purpose of facilitating the construction of said work does hereby for himself . . . and for his . . . heirs and assigns, grant release and relinquish unto the said Peru and Indianapolis Rail Road Company the right of way for so much of said Road as may pass through or cut the following piece parcel or lot of land, to wit, [description of land], for the sum of one hundred and thirty seven dollars and fifty cents, to be paid as follows, to wit, one half of said sum shall be paid on the Second day of November AD 1848, and the other half shall be paid in three months from that date.  The foregoing release is upon the following condition, to wit, that the said Elijah James reserves to himself . . . all the wood and timber now standing or being upon the track of said Road. The said Rail Road Company agree to dig two pits upon said Road sufficient to keep cattle sheep and hogs, and horses and . . . other live stock from passing over them, at such places upon the premises as the said Elijah James shall designate, and it is further agreed that the said Elijah James shall furnish timber and lumber for the construction of such pits and plank up the same.

A railroad line was constructed, and a railroad operated, in the corridor acquired by the PIRC.  Eventually, in 1995, the line was purchased by three Indiana municipalities:  the City of Fisher, the City of Noblesville, and Hamilton County.  In 2017, the municipalities advised the Surface Transportation Board ("Board") of their collective desire to invoke the Trails Act, 16 U.S.C. §§ 1241-1251, which, as amended, provides for the preservation of "established railroad rights-of-way for future reactivation of rail service" by authorizing the interim use of such rights-of-way as recreational and historical trails.  Id. § 1247(d).  The following year, they submitted three separate requests to the Board, each relating to the portion of the railroad line for their respective municipalities, for the issuance of a Notice of Interim Trail Use or Abandonment ("NITU").  A NITU permits the discontinuation of rail service, the salvaging of track and materials, and, if an agreement regarding trail use is not reached, the abandonment of the line. 49 C.F.R. § 1152.29(d)(1).  The Board issued the three NITUs on December 21, 2018, and the municipalities executed trail-use agreements in 2019.

After the Board issued the NITUs, a number of suits were filed in this court in which owners of parcels adjacent to the railroad line alleged that through the operation of the Trails Act and the issuance of the NITUs, defendant had taken their property without paying just compensation in violation of the Fifth Amendment.  In June 2020, the plaintiffs in Oldham, Pressly, Bradley, and ATS Ford proposed a coordinated approach to resolving their claims. Specifically, they sought to divide themselves into three groups:  Group 1 plaintiffs had no outstanding liability issues and could proceed to damages; Group 2 plaintiffs had claims that required the resolution of an essentially identical threshold title issue; and Group 3 plaintiffs had other outstanding liability issues.  Further, with respect to Group 2, plaintiffs proposed that the court set a schedule for the parties to brief a motion to certify questions to the Indiana Supreme Court that would affect the outcome of the Group 2 plaintiffs' claims.

In a July 22, 2020 order, the court adopted plaintiffs' proposal, over defendant's objection, to divide plaintiffs into the three identified groups.  However, it was not persuaded that separately briefing whether to certify questions to the Indiana Supreme Court would be the most efficient approach to resolving the issue presented by the claims of the Group 2 plaintiffs. Rather, it directed the parties to brief cross-motions for summary judgment, while permitting plaintiffs to request certification to the Indiana Supreme Court within their motions.  It further noted that it would not hear argument on these motions unless requested by one or more of the parties.

The Group 2 cross-motions for summary judgment are now fully briefed, and none of the parties requested oral argument.[6]  Thus, the motions are ripe for adjudication.

## II.  DISCUSSION

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  R. Ct. Fed. Cl. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The primary issue addressed by the parties in their cross-motions for summary judgment is straightforward:  whether the releases by which the PIRC acquired portions of its railroad corridor conveyed easements or fee simple estates.  The relevant facts are not in dispute, making this issue particularly well suited for resolution by summary judgment.  See Varilease Tech. Grp., Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002) ("Contract interpretation is a question of law generally amenable to summary judgment.").

### A.  The Claims at Issue

As a threshold matter, the parties dispute whether it was appropriate for defendant to seek summary judgment with respect to the claims of certain Group 2 plaintiffs whose property interests were not affected by the releases described above.  In its cross-motion for summary judgment, defendant contends that although the claims of certain Group 2 plaintiffs are not

---

[6]  The briefing is substantively identical in all four cases.  Accordingly, the court is filing a substantively identical decision in each case.  The only difference among the four decisions is the case caption.

dependent on the interpretation of the releases, the binding Indiana Supreme Court precedent construing the PIRC's legislative charter applies in equal force to those claims, and therefore those claims can be resolved.  Plaintiffs respond that such claims are beyond the scope of the summary judgment briefing ordered by the court.

The parties' disagreement arises from their competing interpretations of the court's July 22, 2020 order.  In that order, the court discussed the status of the claims of each of the three groups of plaintiffs.  For the Group 2 plaintiffs, the court concluded:

> [B]ecause the identical issues (pertaining to whether the Releases conveyed a fee simple interest or an easement to the PIRC) affects a significant number of plaintiffs in the moving plaintiffs' cases, the court finds that a coordinated approach to resolving the issues is prudent.  Consequently, the court will set a schedule for briefing cross-motions for summary judgment limited solely to these issues. . . .  Due to the narrowness of the legal issues, the court believes that the parties' motions can be resolved expeditiously.

Order 6.  For the Group 3 plaintiffs, the court observed that "[t]he moving plaintiffs represent that there may be non-Release-related threshold title issues with respect to these plaintiffs' claims that prevents the parties from reaching an agreement on liability," and advised that it would "not schedule summary judgment briefing on any remaining threshold title issues before the conclusion of summary judgment briefing related to the Releases." Id. at 7.  Then, in providing a schedule for further proceedings, the court directed the filing in each case of a notice identifying the plaintiffs "(1) that are eligible to proceed to the damages phase (Group 1 plaintiffs), (2) for which the government's liability depends solely on how PIRC's legislative charter and the Releases are interpreted (Group 2 plaintiffs), and (3) that have claims with other unresolved threshold title issues (Group 3 plaintiffs)." Id. at 8.  Finally, the court introduced the summary judgment briefing schedule with the following directive:  "With respect to the plaintiffs that assert claims for which liability depends solely on the interpretation of the Releases and/or the PIRC legislative charter, the parties shall brief cross-motions for summary judgment . . . ." Id. at 9.

Defendant interprets the court's order to mean that it should brief issues that involved construction of the PIRC's legislative charter, regardless of whether a release was at issue.  It further remarks that some of the plaintiffs placed in Group 2 do not assert claims dependent on the construction of a release, and therefore those claims are properly before the court on summary judgment.  Plaintiffs acknowledge that some plaintiffs with claims not dependent on the interpretation of a release were included in Group 2, but assert that the court's order should be read to limit summary judgment briefing to those claims that required the construction of a release.

When it issued its order, the court understood that plaintiffs intended to include in Group 2 only those plaintiffs whose claims depended on the construction of a release, and recognized that it was defendant's position that reference to the PIRC's legislative charter (and certain Indiana Supreme Court precedent) was necessary for such construction.  Thus, it described the "narrow[]" issues that would be addressed for the Group 2 plaintiffs on summary judgment as

those that "pertain[ed] to whether the Releases conveyed a fee simple interest or an easement . . . ." It also stated that it would not schedule briefing on any unresolved "non-Release-related threshold title issues before the conclusion of summary judgment briefing related to the Releases." The court did not intend for its subsequent references to the PIRC's legislative charter to broaden the scope of the summary judgment motions. Thus, even if defendant is correct that a decision regarding the interplay of the releases, legislative charter, and state-court precedent may compel or strongly support a certain result for other claims, the court declines to render summary judgment on those claims through the motions before the court.

In the table below, the court identifies the claims (by case, release, and claim number) that it will address in this decision:[7]

| Release | Oldham | Pressly | Bradley | ATS Ford |
|---|---|---|---|---|
| Bradley | | 24, 47, 51, 114, 136, 142, 186, 197, 224, 225, 266a, 266b, 301, 302, 307 | | |
| Cropper | | 115, 119a, 119b, 228, 236a | 36, 37 | 31 |
| Culbertson | 12 | | 24 | |
| James | 16, 21, 24 | 5, 43a, 43b, 43c, 43d, 59, 86, 121, 173, 180, 254, 257 | 27, 38 | 36, 37 |
| Lovett | 4 | 11, 60, 189 | | 41, 42, 43, 44, 45 |
| McCole | | 157 | | 1 |
| Oaput/ Opput[8] | 30 | 135c | | |
| Phipps | 15 | 37, 96, 125, 126, 131, 135a, 185, 233, 281 | 20, 29 | 28 |
| Shelley | | 236b | | 30 |
| Silvey | | 20, 164 | | |

---

[7] Several claims appear in the table more than once because their resolution depends on the construction of more than one release: Oldham claim 9; Pressly claims 71, 226, and 289; and Bradley claim 24. In addition, three claims in the table are identified by plaintiffs as belonging to a Group 2 plaintiff but do not appear in Exhibit 5 to defendant's cross-motion for summary judgment: Pressly claims 46, 157, and 303.

[8] In their table setting forth the claims of the Group 2 plaintiffs, plaintiffs in Pressly identify the source conveyance for claim 135c as "Gappert-Deed Book 182 & Page 142." It is apparent that this "Gappert" conveyance is the same as the "Wm. Oapert Release" identified by the Oldham plaintiffs as the source conveyance for claim 30, since the Interstate Commerce Commission ("ICC") valuation map and parcel number (V9 3/7) are the same for both conveyances.

| Smith | | 10, 49, 73, 77, 82, 91, 105, 113, 139, 178, 196, 201, 273, 303 | 24, 34 | 33 |
|---|---|---|---|---|
| Sterritt | | 71, 183 | | |
| Sutherland | | 14, 167a, 167b, 245 | 18 | |
| Threlkell[9] | 19, 33 | 46 | | |
| Weever | 32 | 2, 8, 31a, 31b, 33, 65(b), 90, 98, 100, 107, 152, 154, 190, 202, 212, 230, 232, 286 | 11 | |
| West | | 45a, 45b, 45c, 45d, 71, 177a, 177c, 223, 279 | | 26 |
| Wright (1848) | 9, 10 | 42, 52, 67a, 67b, 72 (part),[10] 75, 209a, 209b, 226, 289 | | |
| Wright (undated) | | 17, 21a, 21b, 226, 277 | | |
| Young | 9 | 289, 296, 297 | | |

Relatedly, although plaintiffs included the following claims in Group 2, they are not solely dependent on the construction of a release.  Thus, the court will not address them in this decision and instead moves them into Group 3:

| Case | Claim |
|---|---|
| Oldham | 6, 13, 22 |
| Bradley | 16, 19, 28,[11] 32, 33 |
| ATS Ford | 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 27[12] |

---

[9]  Plaintiffs in ATS Ford identified the release executed by Willis Threlkell on February 12, 1849 ("Threlkell release") as one of two source conveyances for claim 34, but included claim 34 in Group 3.  Thus, the court does not address this claim in this decision.

[10]  The parcel described in Pressly claim 72 is adjacent to two segments of the railroad corridor:  one acquired by the PIRC via a release and one acquired by the PIRC via adverse possession.  Only the acquisition of the former segment is at issue in this decision.

[11]  Plaintiffs in Bradley identified two source conveyances for claim 28:  a release in the court's record and an instrument referred to as "Anna M. Sutton, Book 291, Page 478- IN HAND."  Because the latter instrument is neither identified as a release nor in the record before the court, the court cannot address Bradley claim 28 in this decision.

[12]  Plaintiffs in ATS Ford identified the source conveyance for claim 27 as "Jwright" and the relevant ICC valuation map and parcel number as V9 4/13.  It is unclear whether this source conveyance is the release executed by James T. Wright in 1848 ("1848 Wright release"), the release executed by James T. Wright on an unspecified date in the 1840s ("undated Wright release"), or neither; plaintiffs in the other cases associate the 1848 Wright release and undated Wright release only with the following ICC valuation maps and parcel numbers:  V9 3/12; V9

Having specified the claims at issue, the court turns to their resolution.

## B. The Property Interest Acquired by the PIRC via the Releases

The Fifth Amendment prohibits the federal government from taking private property for public use without paying just compensation. U.S. Const. amend. V. To establish a taking, a plaintiff must first "identif[y] a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1348 (Fed. Cir. 2013); accord Klamath Irrigation Dist. v. United States, 635 F.3d 505, 520 n.12 (Fed. Cir. 2011) ("It is plaintiffs' burden to establish cognizable property interests for purposes of their takings . . . claims."). To demonstrate a cognizable property interest in a Trails Act case, a plaintiff must establish, among other things, that the railroad company acquired an easement for railroad purposes. Ellamae Phillips Co. v. United States, 564 F.3d 1367, 1373 (Fed. Cir. 2009); Preseault v. United States ("Preseault II"), 100 F.3d 1525, 1533 (Fed. Cir. 1996) (en banc). In general, state law governs the determination of the property interest acquired by the railroad company. See Preseault v. Interstate Com. Comm'n, 494 U.S. 1, 8 (1990) ("State law generally governs the disposition of reversionary interests . . . ."); Preseault II, 100 F.3d at 1534 ("The question of what estates in property were created by these turn-of-the-century transfers to the Railroad requires a close examination of the conveying instruments, read in light of the common law and statutes of [the state] then in effect."). Moreover, the acquisition of property rights is governed by the law in effect at the time the rights were acquired. See Hash v. United States, 403 F.3d 1308, 1315 (Fed. Cir. 2005); Preseault II, 100 F.3d at 1534.

As noted above, the issue before the court is whether the releases by which the PIRC acquired portions of its railroad corridor adjacent to parcels owned by the Group 2 plaintiffs conveyed easements or fee simple estates. Defendant contends that the Indiana Supreme Court has concluded that the releases, when read in conjunction with the PIRC's legislative charter, conveyed a fee simple estate to the PIRC. It relies on the Indiana Supreme Court's decisions in Newcastle & Richmond Railroad Co. v. Peru & Indianapolis Railroad Co., 3 Ind. 464 (1852), and Indianapolis, Peru & Chicago Railway Co. v. Rayl, 69 Ind. 424 (1880). Plaintiffs respond that the statements that defendant relies on from those decisions are mere dicta and that Indiana courts have declined to broadly apply that purported dicta in subsequent decisions. Moreover, they contend that those decisions may no longer be good law in light of more recent Indiana Supreme Court precedent that addresses the use of the term "right of way" in a deed.

As it must, the court begins its analysis by considering the law in effect in Indiana at the time the releases at issue were executed.

_____

4/1; V9 4/10; and V9 4/12. Accordingly, the court cannot address ATS Ford claim 27 in this decision.

### 1. Railroad Law and Property Law in Indiana in the Mid-Nineteenth Century

Indiana became a state on December 11, 1816.  Resolution for admitting the state of Indiana into the Union, 3 Stat. 399 (1816).  When the Indiana General Assembly enacted the statute incorporating the PIRC almost thirty years later in 1846, Indiana did not have a law governing the incorporation of railroad companies.  See Douglass v. Thomas, 2 N.E. 562, 564 (Ind. 1885); see also Ind. Rev. Stat. ch. 83 (1852) (reflecting that the "Act to provide for the incorporation of Rail Road Companies" was approved on May 11, 1852); Vandalia R.R. Co. v. Topping, 113 N.E. 421, 423 (Ind. App. 1916) (recognizing that "the law providing for the incorporation of railroad companies approved May 11, 1852," governed the construction of the release at issue).  Rather, the legislature incorporated railroad companies by enacting individual charters.  Louisville & Ind. R.R. Co. v. Ind. Gas Co., 829 N.E.2d 7, 9 n.1 (Ind. 2005).  Consequently, different railroad companies could have different powers to acquire land to construct their railroads.  See, e.g., Water Works Co. of Indianapolis v. Burkhart, 41 Ind. 364, 375 (1872) (observing that "the legislature may grant to different companies power to take a greater or less quantity of land, and such grant will be conclusive as to the necessity for the uses specified").  However, regardless of a legislative charter's provisions, a railroad company retained its common-law right to "make contracts" related to the acquisition of real estate.  See Cleveland, Columbus, Cincinnati & Indianapolis Ry. Co. v. Coburn, 91 Ind. 557, 559-60 (1883) (per curiam).

In a statute enacted on May 11, 1852, the Indiana General Assembly standardized the incorporation of railroad companies.  See Ind. Rev. Stat. ch. 83 (1852).  However, existing railroad companies continued to operate under their pre-1852 legislative charters unless they subsequently accepted the terms of the new statute.  See id. at ch. 83, § 36 ("All existing railroad companies may acquire all of the powers or benefits conferred by this act, by filing an acceptance thereof in the office of the Secretary of State . . . , and the acceptance of any part of this act shall be deemed to be an acceptance of the whole act, and a surrender of the act under which such company may be organized . . . .").  There is no evidence in the record indicating that the PIRC accepted the 1852 statute in lieu of its legislative charter.

### 2. Indiana Supreme Court Decisions Directly Addressing the PIRC's Legislative Charter and Acquisition of the Railroad Corridor

The Indiana Supreme Court first considered the PIRC's legislative charter in Newcastle.  In that case, the PIRC sought to enjoin a competitor from constructing a railroad, 3 Ind. at 465, contending that the competitor could not cross the PIRC's railroad without violating the PIRC's "exclusive right to the use of the ground over which the track of their road passes," id. at 468.  The court began its analysis by describing the relevant provisions of the charter:

> Section 15 of the charter of said company authorizes them to obtain releases of the land along the line of the road; section 16 permits them, where a voluntary release is refused, to have the land condemned in the manner usual in such cases; and section 19 declares "that when said corporation shall have procured the right of way" in either of said modes, "they shall be seized in fee simple of the right to such land, and they shall have the sole use and occupancy of the same," etc.

Id.  It then rejected the PIRC's contention that section 19 was "a contract on the part of the state for the exclusive possession by said company of the lands mentioned," explaining its view that section 19 was

> simply intended as declaratory of the effect which the releases and condemnations of land spoken of in the 15th and 16th sections should have; that is, whether they should be taken to convey an easement, a right of way merely, or a fee-simple title, and declaring it should be the latter; that they should have the same force that deeds from the proprietors in the usual form to the company, conveying to their sole use, etc., would have, subject of course, as expressly declared in the section, to all previous grants of rights of way, and subject, impliedly of course, as all ordinary grants of land by one person to another, or by the state to a person, are, to the right of the state to take the lands granted, on compensation made, for the public use.

Id.  In other words, it concluded that releases executed pursuant to the PIRC's legislative charter conveyed fee simple title, subject to existing easements and the state's authority to later take the land for public use upon providing compensation.

Notably, the Indiana Supreme Court in Newcastle was concerned only with the PIRC's legislative charter and not any specific conveyances made pursuant to the charter.  However, almost thirty years later, it rendered decisions in two cases involving such conveyances.  The first case concerned a deed executed in 1951 in which the landowners agreed to "give, grant, convey and confirm" nine lots that "were the property" of one of the landowners to the PIRC to use as a railroad depot.  Indianapolis, Peru & Chi. Ry. Co. v. Hood, 66 Ind. 580, 583 (1879).  A successor to the PIRC stopped using the lots for a depot in 1869, and the landowners' heirs sued to quiet title in the lots.  Id. at 581-82.  Without mentioning the PIRC's legislative charter, the court concluded that the railroad company "took and held the said lots . . . upon the condition subsequent" that it "permanently locate and construct its depot . . . upon the said lots," that the condition was breached when the railroad company stopped using the lots for a railroad depot, and that "the ownership [of the lots] reverted to" the landowners' heirs.  Id. at 584; accord id. at 585 (holding that "breach of the condition subsequent in the said deed . . . worked a forfeiture of the [railroad company]'s estate in said lots under said deed, and rendered them subject to be recovered back by the [landowners'] heirs").

In the second case, Rayl, the plaintiffs owned lots adjoining a strip of land that the public had begun to use as a street, which, in turn, adjoined a railroad line owned by a successor to the PIRC.  69 Ind. at 424, 427-28.  The railroad company, without initiating condemnation proceedings, constructed a side track on the land being used as a street, causing injury to the plaintiffs.  Id. at 424-25.  The issue to be decided by the Indiana Supreme Court was whether the evidence was sufficient to support the trial court's finding that the railroad company did not own the strip of land.  Id.

After describing the relevant sections of the PIRC's legislative charter, the court set forth the contents of the original conveyance to the PIRC.  Id. at 426-27.  In contrast to the

conveyance at issue in Hood—a deed in which the landowners agreed to "give, grant, convey and confirm" nine lots to the PIRC, 66 Ind. at 583—the conveyance in Rayl was a release ("Richmond release") that used language nearly identical to the language appearing in most of the releases at issue in this case:

> I, Corydon Richmond, of the county of Howard and State of Indiana, for and in consideration of the advantages which can or will result to the public in general and myself in particular, by the construction of the Peru and Indianapolis Railroad, as now is, or may hereafter be, surveyed or located, for the purpose of facilitating the construction and completion of said work, do hereby, and for myself, my heirs, executors, administrators and assigns, release and relinquish to the Peru and Indianapolis Railroad Company the right of way for so much of said road as may pass through and out the following piece or parcel of land, to wit: The south-east quarter of section 25, township 24 north, range 3 east; and I do further release and relinquish to said Peru and Indianapolis Railroad Company all damages, and right to damages, which I may sustain or be entitled to by reason of anything connected with, or consequent upon, the construction of said road or road-bed.

69 Ind. at 426-27. The plaintiffs argued that the Richmond release was void for two reasons: "because it did not specify the extent or width of the land intended to be relinquished by it" and because, "at the time the relinquishment was made, the legal title to the land was not in Richmond, but in the United States." Id. at 428; see also id. at 426-27 (indicating that although Mr. Richmond possessed and occupied the tract of land at issue when he executed the release in 1847, the United States did not patent and convey the tract to Mr. Richmond until 1849[13]).

To address the plaintiffs' first contention, the court referred to the PIRC's legislative charter. It observed that the charter allowed the PIRC to use a strip of land not exceeding eighty

---

[13] During the nineteenth century, Congress enacted a series of laws allowing citizens to acquire public land from the federal government; the government conveyed title to the land by issuing a patent. See United States v. Schurz, 102 U.S. 378, 396 (1880); accord Swendig v. Wash. Power Co., 265 U.S. 322, 331 (1924) ("[W]hen a patent issues in accordance with governing statutes, all title and control of the land passes from the United States." (citation omitted)). See generally Russian-Am. Packing Co. v. United States, 199 U.S. 570, 577-78 (1905) ("[T]he occupation and cultivation of public lands with a view to pre-emption confers a preference over others in the purchase of such lands by the bona fide settler . . . . [A] vested right, under the pre-emption laws, is . . . obtained when the purchase money has been paid, and receipt from the proper land officer given to the purchaser. . . . When this payment is made, the other prerequisites having been complied with, the settler is then entitled to a certificate of entry from the local land office and ultimately to a patent."). Indeed, the patent referenced in Rayl reflects that the United States conveyed the specified tract to Mr. Richmond and his heirs "forever." U.S. Gen. Land Office, Bureau of Land Mgmt., Land Patent Accession No. IN1940__.455 (Apr. 10, 1849), https://glorecords.blm.gov/search/default.aspx?searchTabIndex=0&searchByTypeIndex=0 (choose "Indiana" from the state dropdown; then enter "Richmond" and "Coryden" in the name fields; then click "Search Patents"; then click on the image icon).

feet in width, and concluded that "under section 15 of [the charter], a general relinquishment of the right of way over a tract of land, without specifying any width, conferred upon that company the right to take and appropriate a strip of ground, over the tract specified, not exceeding eighty feet in width." Id. at 428-29.  It further explained that "the act of incorporation thus form[ed] a part of the contract of relinquishment." Id. at 429.

In addressing the plaintiffs' second contention, the court again referred to the PIRC's legislative charter and, without mentioning Newcastle,[14] concluded:

> That relinquishment, as we have construed it, supplemented by section 19 . . . of the act of incorporation, enacting that the right of way, when acquired, should be held by the company in fee-simple, purported to convey to the company an estate in fee-simple to so much of the land described in it as constituted the right of way through the land under such relinquishment.  Under such circumstances, whatever title Richmond subsequently acquired to the land relinquished by him enured to the benefit of the company.

Id.  Mr. Richmond subsequently acquired full title to the land from the United States.  Id. at 427.  The court therefore held "that the strip of ground in controversy, . . . was not, and never had been, a public street of the town . . . , but was at the time the side-track complained of was laid down, and has since continued to be, the property of the [railroad company]." Id. at 429-30; see also id. at 430 (indicating that it was reversing the trial court's judgment).  In other words, under the Richmond release, the PIRC obtained a fee simple interest in the strip of land on which it constructed the side track.

### 3.  Later References to Newcastle and Rayl by Indiana Appellate Courts

Although the Indiana Supreme Court has not had further occasion to construe the PIRC's legislative charter or conveyances executed pursuant to the charter, both it and the intermediate state appellate court have mentioned or discussed Newcastle and Rayl in subsequent decisions.  A brief summary of the relevant decisions, presented chronologically, follows.

In its 1872 decision in Burkhart, the Indiana Supreme Court addressed a dispute over ownership of a strip of land on which a canal was constructed, and needed to determine the interest that the State of Indiana acquired through appropriation.  41 Ind. at 365, 368.  In discussing the power of the State to appropriate the land, the court cited Newcastle and other decisions for the proposition that "the legislature is the sole and exclusive judge of the public exigency, and of the mode and manner of exercising the right of taking the property required, subject only to the limitation of making proper provision for ascertaining and making compensation for the property taken." Id. at 375-76.

---

[14]  The court also did not mention Hood, likely because that case involved a deed rather than a release, 68 Ind. at 583, and because the charter was not part of the record before the court, see id. (indicating that the statement of facts, which did not refer to the charter, and the deed "constituted all the evidence given in the cause").

The Indiana Supreme Court next mentioned Newcastle in its 1883 decision in Coburn. 91 Ind. at 559-60.  In that case, a railroad company sought to quiet title in a strip of land that had been enclosed, in part, by adjoining landowners.  Id. at 557-58.  The railroad company's predecessor was chartered in 1848.  Id. at 558.  Section 21 of the charter, which was nearly identical to section 19 of the PIRC's legislative charter, provided that "when said company shall have procured the right of way as hereinbefore provided they shall be seized in fee simple of the right of said land, and shall have the sole use and occupation of the same, and no person . . . shall in any way interfere therewith, or disturb, molest or injure any of the rights and privileges hereby granted, so as to detract from or affect the profits of said corporation."  Id. at 558-59 (omission in original).  The court observed that "[t]he language of this section is somewhat obscure" and that "[i]n the absence of any judicial construction of this language, it might be supposed to mean that the company shall be the owner of the right relinquished, which might be a fee, or a less estate, or a mere easement, according to the terms of the written relinquishment."  Id. at 559.  "But," it noted, it construed "the very same language, in another charter" in Newcastle.  Id.  It remarked that "[u]nder [that] construction, an unconditional relinquishment of the land undoubtedly would have vested in the railroad company the absolute fee simple of the land, but the statute under consideration can not be held to impair the right to make contracts."  Id. at 559-60.

The court concluded that the release at issue was not unconditional.  Id. at 561.  In the release, the land was described as "[o]ut-block 182" and the landowner "reserve[d] the right to lay down and keep a railroad track in front of the lots adjoining the road, and also of connecting the same with the track of the railroad . . . ."  Id. at 560-61.  Other evidence reflected that the railroad company intended to build its depot on out-block 181.  Id. at 561.  The court determined that the intent to build the depot on out-block 181, the location of the track on out-block 182, and the railroad company's acceptance of the release "were parts of one transaction," and that the parties' intention was for the construction and permanent maintenance of a depot and a track approaching the depot.  Id.  It therefore held "that the relinquishment in controversy created in the railroad company an estate upon condition subsequent, liable to be defeated upon the non-performance of the condition."  Id. at 562.

Subsequently, in its 1885 decision in Douglass, the Indiana Supreme Court described the holding of Rayl as being tied to the specific facts of that case:  "It was held in [Rayl] that an instrument conveying the right of way to the railroad company there concerned, supplemented by the nineteenth section of the act under which it was incorporated, did [convey a fee simple]."  Douglass, 2 N.E. at 563-64.  It further observed that "[t]he act of incorporation in that case . . . expressly provided that the right of way, when acquired, should be held in fee-simple by the corporation."  Id. at 564; cf. id. (distinguishing Rayl because the record before it did not include any information regarding the nature of the railroad company's charter, requiring it to "construe the deed according to the terms employed in the instrument").

Less than three years later, in Quick v. Taylor, the Indiana Supreme Court determined who owned a strip of land originally acquired by a railroad company via condemnation "under the general railroad law in force since 1853."  16 N.E. 588, 589 (Ind. 1888).  It acknowledged its holding in Burkart that the state legislature intended to appropriate the land to construct the canal at issue in that case in fee simple, but noted that the "ruling has been followed reluctantly, and has not been applied except to lands acquired under the internal improvement act of 1836."  Id.

-15-

Then, it remarked that "the rule that controlled the decision of [those] cases," including Rayl, "had not been applied to the taking of land by private or merely quasi public corporations, in the absence of an express statute authorizing the appropriation of the fee-simple," an apparent reference to railroad company legislative charters specifically authorizing the appropriation of fee simple estates.  Id.  It concluded:

> The doctrine generally accepted is that the right acquired by the power of eminent domain extends only to an easement in the land taken, unless the statute plainly provides for the acquisition of a larger interest.  There can be no doubt but that the state has the power to take land in fee for a public use; nor can it be doubted but that power so to take land may, by express enactment, be conferred upon a railway or other corporation; but unless the act from which the power to take is derived in express terms confers the power to take the fee, or unless the retention of the fee by the land-owner would be necessarily inconsistent with the use for which the land was to be appropriated, the presumption will be indulged that only an easement is to be taken.

Id. at 589-90 (citations omitted).

The Appellate Court of Indiana discussed Newcastle and related decisions in Meyer v. Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co., 113 N.E. 443 (Ind. App. 1916).  In that case, a railroad company sought to quiet title to a tract of land that it had occupied adversely for longer than the statutory period.  Id. at 443-44.  It asserted that its adverse possession resulted in fee simple title, rather than a prescriptive easement, relying in part on the provisions of its predecessor's legislative charter, which was enacted in 1832.  Id. at 444-45.  In that charter, sections 14 and 15 provided for the acquisition of a right of way by, respectively, relinquishment and condemnation, and section 19, which was nearly identical to section 19 of the PIRC's legislative charter, provided:

> That when said corporation shall have procured the right of way as herein provided, they shall be seised in fee simple of the right to use such land, and shall have the sole use and occupancy of the same; and no person . . . shall in any way interfere with, molest, disturb or injure any of the rights and privileges hereby granted, or that could be calculated to detract from or affect the profits of such corporation.

Id. at 445 (omission in original).  The court remarked that "[l]iterally construed, the language used" in section 19 "seems to refer to a right in the land as distinguished from the land itself," id., and observed that "a fee may exist in an easement," id. (quoting Branson v. Studabaker, 33 N.E. 98, 104 (Ind. 1892)).  It recognized, however, that "the question of the title acquired by relinquishment or condemnation under the act is not an open one" and proceeded to describe the relevant holdings of Newcastle and Coburn.  Id. at 445-46; accord id. at 446 ("[I]t is recognized that under the [legislative charters discussed in this case, Newcastle, and Coburn], the courts hold that by condemnation or by release, in the absence of a contract to the contrary, the lands involved are acquired in fee.").  Ultimately, the court distinguished the case before it, concluding that "[w]hatever interest or estate [the railroad company] owns in the land involved here is based

-16-

on the fact that the use of such lands for the full prescriptive period, or in other words, such interest or estate, is in the nature of a prescriptive right." Id. at 447.  Thus, it held that the railroad company held merely an easement over the land for railroad purposes.  Id.

There are several common threads running through these decisions.  First, the courts acknowledged that Newcastle and Rayl were binding precedent.  See Quick, 16 N.E. at 589; Douglass, 2 N.E. at 564; Coburn, 91 Ind. at 559-60; Burkart, 41 Ind. at 375-76; Meyer, 113 N.E. at 445-46.  Second, the courts recognized, either explicitly or implicitly, that the state legislature could, by statute, define the scope of the property interest that could be acquired by condemnation or relinquishment.  See Quick, 16 N.E. at 589-90 (condemnation); Douglass, 2 N.E. at 563-64 (any acquisition); Coburn, 91 Ind. at 559-60, 562 (relinquishment); Burkart, 41 Ind. at 375-76 (condemnation); Meyer, 113 N.E. at 445-46 (condemnation and relinquishment). Third, the courts affirmed that a railroad company retained the right to contract for a greater or lesser estate than what was described in its legislative charter.  See Coburn, 91 Ind. at 559-60; Meyer, 113 N.E. at 446.  Finally, neither court disturbed the holding of Newcastle that the PIRC's legislative charter provided that the releases it authorized conveyed fee simple estates or the holding of Rayl that the Richmond release, executed pursuant to the PIRC's legislative charter, conveyed a fee simple estate.

### 4.  The Relevant Portions of Newcastle and Rayl Are Not Dicta

Notwithstanding the Indiana Supreme Court's treatment of Newcastle and Rayl as settled law, plaintiffs argue that the discussions in those decisions of section 19 of the PIRC's legislative charter and the Richmond release are dicta because they had no effect on the court's ultimate conclusions in those decisions.  See Nat'l Am. Ins. Co. v. United States, 498 F.3d 1301, 1306 (Fed. Cir. 2007) (defining dicta as statements that are not necessary for a decision).  Plaintiffs are mistaken.

As described above, the issue in Newcastle was whether the PIRC held the exclusive right to the land on which it constructed its railroad.  3 Ind. at 468.  The PIRC argued that its exclusive right derived from section 19 of its legislative charter.  Id.  The Indiana Supreme Court disagreed, explaining that section 19 merely declared that the effect of a release or condemnation under the charter was to convey a fee simple estate (as opposed to an easement or a right of way), and did not disturb any preexisting easements over the land or the state's authority to permit the condemnation of the land.  Id.  The court determined that the PIRC did not have the exclusive right to the land it acquired to construct its railroad, and to reach that conclusion it found it necessary to determine both the scope of the rights actually granted by the PIRC's legislative charter and whether those rights were exclusive, even as to the State.  It could not engage in such an analysis without determining how section 19 of the charter should be construed.  Consequently, the court's construction of section 19 is not dicta.  Accord Coburn, 91 Ind. at 559-60 (recognizing Newcastle's construction of section 19 of the PIRC's legislative charter as binding authority); Meyer, 113 N.E. at 445 (same).

In Rayl, the issue before the Indiana Supreme Court was whether a successor to the PIRC owned a strip of land, adjacent to its line, that had been put to use as a public street.  69 Ind. at 424-25.  The railroad company claimed ownership of the land through the Richmond release.  Id.

at 424-25, 428.  But, according to the plaintiffs, the Richmond release was void because it did not specify the width of the strip of land and because Mr. Richmond did not own the land at the time he executed the release.  Id. at 425, 428.  The court addressed both contentions by analyzing the Richmond release in light of the provisions of the PIRC's legislative charter, and concluded that they lacked merit.  Id. at 428-30.  Notably, with respect to the second contention, the court concluded that the Richmond release, when read in conjunction with section 19 of the PIRC's legislative charter, "purported to convey to the company an estate in fee-simple to so much of the land described in it as constituted the right of way through the land under such relinquishment," and that Mr. Richmond relinquished to the PIRC "whatever title [he] subsequently acquired to the land . . . ."  Id. at 429; accord Ind. Rev. Stat. ch, 28, § 20 (1843) ("A deed of release or quit claim of the usual form shall pass all the estate which the grantor had and could convey by a deed of bargain and sale.").  Because Mr. Richmond subsequently acquired title to the land from the United States via a patent, 69 Ind. at 427, the court held that the strip of land "was . . . the property of the" railroad company, id. at 429-30.[15]

Clearly, the Indiana Supreme Court could not have concluded that the railroad company owned the land without first determining that the Richmond release conveyed a fee simple estate to the PIRC.  Accordingly, its construction of the Richmond release is not dicta.  Moreover, plaintiffs' characterization of Rayl as a case regarding the width of the right of way granted by the Richmond release ignores the remainder of the court's analysis of why the Richmond release was not void, as well as court's conclusion that the PIRC acquired via the Richmond release all that Mr. Richmond owned—a fee simple estate.  In short, the overarching issue in Rayl was who owned the strip of land at issue, and the Indiana Supreme Court concluded that pursuant to the Richmond release, the owner was the railroad company.  Accord Douglass, 2 N.E. at 563-64 (recognizing Rayl's construction of the Richmond release, in light of section 19 of the PIRC's legislative charter, as binding authority).

In addition to contending that the discussions of section 19 of the PIRC's legislative charter and the Richmond release in Newcastle and Rayl are dicta, plaintiffs advance the related argument that neither decision is relevant to this case because they did not concern fee-simple-versus-easement disputes.  Stated differently, plaintiffs contend that Newcastle and Rayl should not control this court's construction of the releases at issue because the Indiana Supreme Court was not asked to, and did not, address whether an instrument executed by the PIRC conveyed a fee simple estate or an easement.  But the fact that those cases did not involve such a dispute does not render the decisions inconsequential.  To the contrary, the Indiana Supreme Court's analysis and construction of the PIRC's legislative charter and the Richmond release, both separately and together, are directly relevant to how this court undertakes those same tasks.  Accordingly, the court rejects plaintiffs' suggestion that Newcastle and Rayl should be disregarded.

---

[15]  Because the Indiana Supreme Court concluded that the PIRC acquired Mr. Richmond's title to the land, the fact that "a fee may exist in an easement," Branson, 33 N.E. at 104, is, contrary to plaintiffs' contention, of no moment.  Mr. Richmond held a fee simple estate, and therefore conveyed a fee simple estate, not an easement, to the PIRC.

**5.  The Indiana Supreme Court Has Not Abrogated <u>Newcastle</u> and <u>Rayl</u> With Respect to Releases Executed Under the PIRC's Legislative Charter**

Plaintiffs next argue that even if the court determines that <u>Newcastle</u> and <u>Rayl</u> have some relevance to the construction of the releases at issue in this case, Indiana courts no longer subscribe to the proposition that a release executed in favor of a railroad company conveys a fee simple estate.  This contention misses the mark.

The circumstances in this case are unique:  at issue are releases (1) executed by a particular railroad company pursuant to a pre-1852 legislative charter, (2) executed when the law provided that such releases conveyed all of the interest held by the landowner, and (3) that are nearly identical to a release construed by the Indiana Supreme Court to convey all title held by the landowner.  Not one of the later decisions discussed by plaintiffs as demonstrating the purported shift in how railroad charters are viewed by Indiana courts satisfy all three of these criteria.  <u>See, e.g.</u>, <u>Ross, Inc. v. Legler</u>, 199 N.E.2d 346, 347-49 (Ind. 1964) (construing deeds executed in 1908 and not mentioning the railroad company's charter); <u>Cincinnati, Indianapolis, St. Louis, & Chi. Ry. Co. v. Geisel</u>, 21 N.E. 470 (Ind. 1889) (failing to specify when the railroad company was chartered or when the release was executed); <u>Quick</u>, 16 N.E. at 588 (reflecting that the land at issue was acquired by the railroad company through condemnation "under the general railroad law in force since 1853"[16]); <u>Douglass</u>, 2 N.E. at 564 (failing to set forth the entirety of the "deed" executed in June 1852 and noting that the record before it did not include any information "concerning the nature of the charter" of the railroad company); <u>Coburn</u>, 91 Ind. at 560-61 (construing a release in conjunction with other evidence constituting part of the same transaction); <u>L. & G. Realty & Constr. Co. v. City of Indianapolis</u>, 139 N.E.2d 580, 582-83 (Ind. App. 1957) (en banc) (construing a deed executed in 1903 and not mentioning the railroad company's charter); <u>Meyer</u>, 113 N.E. at 444 (characterizing the dispute as whether a railroad company acquires a fee or an easement from its adverse occupancy of land); <u>Topping</u>, 113 N.E. at 422 (construing a release executed in 1866 and not mentioning the railroad company's charter).

The more recent decisions discussed by plaintiffs as representing the modern view that the grant of a right of way to a railroad company conveys an easement also fail to satisfy these three criteria.  <u>See, e.g.</u>, <u>Tazian v. Cline</u>, 686 N.E.2d 95, 96, 98 (Ind. 1997) (construing a deed executed in 1873 and not mentioning the railroad company's charter); <u>Brown v. Penn Cent. Corp.</u>, 510 N.E.2d 641, 642-43 (Ind. 1987) (construing a deed executed in 1871 and not mentioning the railroad company's charter); <u>Clark v. CSX Transp.</u>, 737 N.E.2d 752, 759 (Ind. Ct. App. 2000) (remarking that "[t]he property statute in effect at the time of conveyance" was enacted in 1852 and not mentioning the railroad company's charter); <u>Consol. Rail Corp. v.</u>

---

[16]  Plaintiffs also describe a number of Indiana appellate court decisions in support of the proposition that railroad companies obtain only an easement through condemnation.  These decisions, however, address condemnations occurring after the changes to the law in 1853, and not condemnations occurring pursuant to a pre-1853 legislative charter.  <u>See, e.g.</u>, <u>Cleveland, Cincinnati, Chi. & St. Louis Ry. Co. v. Smith</u>, 97 N.E. 164, 169 (Ind. 1912); <u>Chi. & W. Mich. R.R. Co. v. Huncheon</u>, 30 N.E. 636, 637 (Ind. 1892); <u>Cleveland, Cincinnati, Chi. & St. Louis Ry. Co. v. Doan</u>, 94 N.E. 598, 598 (Ind. App. 1911).

Lewellen, 666 N.E.2d 958, 962 (Ind. Ct. App. 1996) (construing post-1852 deeds and not mentioning the railroad company's charter), aff'd, 682 N.E.2d 779 (Ind. 1997); Lake Cty. Tr. Co. v. Lane, 478 N.E.2d 684, 688 (Ind. Ct. App. 1985) (indicating that although the record before it did not include the language of the quit claim deed executed in 1883, a later deed reflected that an easement had been conveyed, and not mentioning the railroad company's charter); Richard S. Brunt Tr. v. Plantz, 458 N.E.2d 251, 252-53, 252 n.1 (Ind. Ct. App. 1983) (construing releases executed in 1881 and noting that "the railroad's charter does not provide for the amount of estate conveyed").  Moreover, the court must ascertain the property interest acquired by the PIRC in light of the law that existed at the time of the acquisition, and the Indiana appellate courts in these modern decisions (and many of the earlier decisions plaintiffs discuss) construe instruments executed under a different statutory regime than the one in place at the time the releases at issue in this case were executed.  Accord Tazian, 686 N.E.2d at 96, 98 (noting that language used in a deed executed in 1873 was "consistent with the controlling property statute in effect at the time of conveyance"); Clark, 737 N.E.2d at 759 (remarking that, "in construing a deed," courts in Indiana "consider[] the instrument relative to the statutes in effect at the time of the conveyance"); see also Lewellen, 682 N.E.2d at 781 (acknowledging the contention that deeds should be construed in light of "the statute in place at the time the deeds were executed," but "emphasiz[ing] that the language of the deeds in question . . . [did] not trace the cited property statutes").

Had the Indiana Supreme Court not rendered the decisions in Newcastle and Rayl, plaintiffs would have a compelling argument under Indiana precedent that the releases at issue in this case conveyed easements.  But those decisions exist, are directly applicable to the legislative charter and releases at issue in this case, and have not been overruled.

### 6. All of the Releases at Issue Conveyed Fee Simple Estates to the PIRC

Because the holdings of Newcastle and Rayl remain authoritative with respect to releases executed pursuant to the PIRC's legislative charter, the court is bound by the Indiana Supreme Court's construction of the Richmond release when construing substantively similar releases. Two of the releases at issue in this case are nearly identical to the Richmond release:  the releases executed by Benjamin Young on March 25, 1851, and John Sutherland on August 24, 1853. Thus, as in Rayl, these releases conveyed a fee simple interest to the PIRC, and the Group 2 plaintiffs whose parcels are adjacent to the land acquired by the PIRC pursuant to these releases do not have cognizable property interests affected by the Board's issuance of the NITUs.

Thirteen other releases include preprinted language nearly identical to the language in the Richmond release, along with a third preprinted paragraph granting the PIRC a license and permit to enter the described land and remove materials for the construction and repair of the railroad:  the 1848 Wright release, the Threlkell release, the undated Wright release, and the releases executed by Peter Weever on July 1, 1848; John Sterritt on September 28, 1848; Abram R. Phipps on October 6, 1848; Daniel R. Smith on November 2, 1848; George West on September 28, 1848; Hilary L. Silvey on October 6, 1848; William Oaput/Opput on October 6, 1848; William Bradley on July 1, 1848; William Culbertson on November 2, 1848; and Leavin Cropper on September 25, 1848.  This additional paragraph closely tracks the language in section 15 of the PIRC's legislative charter that identifies what could be relinquished in a release ("the

stone, gravel and timber, and other materials" on or near the railroad corridor).  Thus, its presence does not alter how the releases are construed and, in fact, plaintiffs do not so argue.  Consequently, as in Rayl, these releases conveyed a fee simple interest to the PIRC, and the Group 2 plaintiffs whose parcels are adjacent to the land acquired by the PIRC pursuant to these releases do not have cognizable property interests affected by the Board's issuance of the NITUs.

The four remaining releases at issue—the McCole release, the Shelley release, the Lovett release, and the James release—require particularized analyses.

The McCole release is substantively similar to the Richmond release with one exception.  After the description of land is the following handwritten clause:  "and do further relinquish all damage for earth taken out Side of the right of way and for earth put out Side the eighty feet or for using other earth or materials taken to construct the Peru & Indianapolis Rail Road across said land."  This clause does not change the character of the interest conveyed by the release, but instead absolves the PIRC of the responsibility to pay damages for moving earth to construct its railroad.  Indeed, unless the clause can be construed to grant the PIRC permission to enter Mr. McCole's land for the purposes of taking and placing earth (not unlike the preprinted paragraph in the majority of the releases at issue), it seems to offer the PIRC no greater protection than the preprinted clause in which Mr. McCole relinquishes the right to damages "by reason of anything connected with or consequent upon" the construction and repair of the railroad.  Thus, the Group 2 plaintiffs whose parcels are adjacent to the land acquired by the PIRC pursuant to this release do not have cognizable property interests affected by the Board's issuance of the NITUs.

The Shelley release is also substantively similar to the Richmond release with one exception.  After the description of land is the following handwritten clause:  "the above Relinquishment is given in consideration of the [PIRC] paying the undersigned Seventeen Dollars & fifty cents and the company further agree to dig two pits for the undersigned where he may designate for the use of his fences where the . . . same may cross."  The additional agreements in this clause are covenants that are part of the consideration for the release.  See Columbia Club, Inc. v. Am. Fletcher Realty Corp., 720 N.E.2d 411, 417 (Ind. Ct. App. 1999) (stating that agreements or promises "to do, or not to do, a particular act . . . relating to real property that are created in conveyances" are covenants); see also Lake Erie & W. R.R. Co. v. Priest, 31 N.E. 77, 78 (Ind. 1892) (holding that "stipulations contained in the proviso" of a deed, in which a railroad company agreed to erect a fence and construct a farm crossing with cattle guards within a year of constructing the railroad, "form[ed] a material part of the consideration for the conveyance" and that "[t]he acceptance of the deed imposed a burden upon the land"); Chi., Indianapolis & Louisville Ry. Co. v. Beisel, 106 N.E.2d 117, 120 (Ind. App. 1952) (describing language appearing after a granting clause in a deed in which the grantee railroad company agreed "to build and maintain fences, and crossings, and cattle guards" as a covenant); Chi. & Se. Ry. Co. v. McEwen, 71 N.E. 926, 929 (Ind. App. 1904) ("[T]he covenants in the deed and in the contract which is made a part thereof were covenants to build and maintain fences, cattle guards, farm crossings, and maintain an underground passway.  They were real covenants running with the land, and, being made by the [railroad company] in part consideration of the conveyance to it by appellee of a strip of land for right of way, they are supported by valuable consideration").  They therefore do not alter the property interest conveyed by the release.  Cf. Cincinnati, Bluffton & Chi. R.R. v. Wall, 96 N.E. 389 (Ind. App. 1911) (indicating that the

remedy for breach of a covenant is damages or specific performance, not the forfeiture of the estate granted in the instrument); accord 21 C.J.S. Covenants § 65 (2021). Accordingly, the Group 2 plaintiffs whose parcels are adjacent to the land acquired by the PIRC pursuant to this release do not have cognizable property interests affected by the Board's issuance of the NITUs.

The Lovett release is the first of two fully handwritten releases in the record before the court. The granting clause of this release is substantively similar to the granting clauses in the previously discussed preprinted releases and the Richmond release. What follows the description of the land, however, is completely different from the other releases. The rest of the Lovett release is prefaced by the following recitation: "The foregoing grant and release is upon the following [agreement] and condition . . . ." Thereafter, several additional agreements between Mr. Lovett and the PIRC are set out: (1) the PIRC agreed to pay Mr. Lovett $20 per acre for the land used for the railroad corridor; (2) the PIRC agreed to either "plank up and keep in repair pits at each and every place where any fence upon said tract of land now crosses the track" or "enclose the road with a good fence and keep the same in repair"; (3) the PIRC agreed to pay for any damages caused by the operation of the railroad and the absence or disrepair of required fences; (4) the PIRC agreed to leave apple trees not in the railroad corridor unharmed; (5) Mr. Lovett reserved all of the wood and timber on the land and in the railroad corridor; (6) Mr. Lovett reserved the right to cross the railroad track; and (7) the PIRC agreed to pay Mr. Lovett in two installments.

As discussed with respect to the Shelley release, the promises made by the PIRC were covenants made in consideration for the conveyance of the right of way through Mr. Lovett's land. See, e.g., Priest, 31 N.E. at 78; Beisel, 106 N.E.2d at 120; McEwen, 71 N.E. at 929. Mr. Lovett's reservations are also covenants. See, e.g., Conduitt v. Ross, 26 N.E. 198, 199 (Ind. 1885) (describing two types of covenants: one "in which a right attached to the estate or interest granted is reserved," and one in which "the grantee covenants that he will do some act on the estate or interest granted which will be beneficial to the grantor").

Because a covenant does not change the property interest conveyed by the granting clause, and because the granting clause in the Lovett release is substantively similar to the granting clause in the Richmond release, the Lovett release, like the Richmond release, conveyed a fee simple estate in the railroad corridor to the PIRC. Consequently, the Group 2 plaintiffs whose parcels are adjacent to the land acquired by the PIRC pursuant to this release do not have cognizable property interests affected by the Board's issuance of the NITUs.

The other handwritten release, the James release, bears many similarities to the Lovett release. The terminology in the granting clauses and the subsequent clauses prefacing the agreements are closely aligned: in the Lovett release, the granting clause uses the words "release and relinquish" and the later clause refers to the conveyance as "[t]he foregoing grant and release," while in the James release, the granting clause uses the words "grant release and relinquish" and the later clause refers to the conveyance as "[t]he foregoing release." In addition, both releases set forth the amount that the PIRC would pay to the landowners and when the payments would be paid; the primary difference is that in the James release, these terms are set forth immediately following the description of the land. Finally, the remaining provisions in the James release track those set forth in the Lovett release: (1) Mr. James reserved all of the

wood and timber in the railroad corridor; (2) the PIRC agreed to dig two pits at locations of Mr. James's choosing to prevent the movement of livestock over the railroad tracks; and (3) Mr. James agreed to provide the PIRC with timber and lumber to construct and plank up the pits.

Although there are differences between the James and Lovett releases, those differences are not sufficiently meaningful to warrant different analyses. Both instruments are releases and both instruments include covenants that have no effect on the nature of the estate conveyed by the granting clauses; indeed, plaintiffs do not contend otherwise. Accordingly, the Lovett release conveyed a fee simple estate in the railroad corridor to the PIRC, and the Group 2 plaintiffs whose parcels are adjacent to the land acquired by the PIRC pursuant to this release do not have cognizable property interests affected by the Board's issuance of the NITUs.

### 7.  The Respect That the Indiana Supreme Court Accords Its Prior Rulings Makes it Highly Unlikely That It Would Overrule <u>Newcastle</u> and <u>Rayl</u> or Decline to Extend the Holdings of <u>Newcastle</u> and <u>Rayl</u> to the Releases at Issue in This Case

In short, the Indiana Supreme Court's holdings in <u>Newcastle</u> and <u>Rayl</u> compel the conclusion that all of the releases at issue in this case conveyed fee simple estates to the PIRC in the railroad corridor. Nevertheless, plaintiffs contend that the Indiana Supreme Court would, if given the opportunity, either overrule the holdings of those decisions or reconcile those holdings with its more recent precedent regarding the construction of deeds such that it would conclude that the releases at issue conveyed easements to the PIRC.

As discussed above, the Indiana Supreme Court has not expressly or implicitly overruled the collective holding of <u>Newcastle</u> and <u>Rayl</u> that a release that looks like the Richmond release, executed pursuant to the PIRC's legislative charter, conveys a fee simple estate in the railroad corridor to the PIRC. That the court has not disturbed its original construction of the PIRC's legislative charter and the Richmond release is consistent with its position that "stability in the decisions of a court of last resort is greatly to be desired." <u>Haskett v. Maxey</u>, 33 N.E. 358, 359 (Ind. 1893). The court explained: "To overrule precedents which have become recognized rules of property, and the basis of contract relations, unsettles titles, disturbs business transactions, and introduces an element of uncertainty into the administration of justice from which the public suffer great inconvenience."[17] <u>Id.</u>; <u>accord</u> <u>Nash Eng'g Co. v. Marcy Realty Corp.</u>, 54 N.E.2d

_____

[17]  The Indiana Supreme Court is not alone in its concern with disturbing titles to real property. Almost thirty years earlier, the United States Supreme Court observed:

> Where questions arise which affect titles to land it is of great importance to the public that when they are once decided they should no longer be considered open. Such decisions become rules of property, and many titles may be injuriously affected by their change. Legislatures may alter or change their laws, without injury, as they affect the future only; but where courts vacillate and overrule their own decisions on the construction of statutes affecting the title to real property, their decisions are retrospective and may affect titles purchased on the faith of their stability. Doubtful questions on subjects of this nature, when once decided, should be considered no longer doubtful or subject to change.

263, 268 (Ind. 1944) (observing that "stare decisis . . . is most frequently applied where to disturb the prior ruling would probably affect real property and vested rights"). Indeed, it has expressed a broad commitment to adhering to its prior rulings:

> The doctrine of stare decisis requires that we apply "a principle of law which has been firmly established." It is a maxim of judicial restraint supported by compelling policy reasons of continuity and predictability that we should be "reluctant to disturb long-standing precedent," and "a rule which has been deliberately declared should not be disturbed by the same court absent urgent reasons and a clear manifestation of error."

Layman v. State, 42 N.E.3d 972, 977 (Ind. 2015) (citations omitted) (quoting Marsillett v. State, 495 N.E.2d 699, 704-05 (Ind. 1986)); accord Prudential Ins. Co. of Am. v. Smith, 108 N.E.2d 61, 63 (Ind. 1952) (remarking that the court "is reluctant to overrule its own precedents if there is any justification in legal principles by which they can be sustained").

In Newcastle, the Indiana Supreme Court held that releases and condemnation proceedings authorized by the PIRC's legislative charter conveyed fee simple estates to the PIRC, and in Rayl, the court held that the PIRC acquired a fee simple estate in the railroad corridor through the Richmond release. For over 140 years, the PIRC, the PIRC's successors, and owners of land adjacent to the portion of the railroad corridor conveyed by the Richmond release have relied on the Indiana Supreme Court's construction of the PIRC's legislative charter and the Richmond release to define their property interests. Any conflicting construction of those documents would call into question the validity of those landowners' titles, as well as the titles of anyone else who acquired land adjacent to a portion of the railroad corridor originally acquired by the PIRC pursuant to a release similar to the Richmond release. Given the Indiana Supreme Court's reluctance to disturb established rules of property and contractual relationships, it seems unlikely that the court would have any interest in overturning the holdings of Newcastle and Rayl, or otherwise reconstruing the PIRC's legislative charter or releases executed by the PIRC substantively identical to the Richmond release.

For this reason, the court declines plaintiffs' suggestion that it certify the proper construction of the releases at issue in this case to the Indiana Supreme Court. Under the Indiana Rules of Appellate Procedure, a federal court may certify a question to the Indiana Supreme Court "when it appears . . . that a proceeding presents an issue of state law that is determinative of the case and on which there is no clear controlling Indiana precedent." Ind. R. App. P. 64 (emphasis added). While the Indiana Supreme Court has previously accepted a certified question from this court, see Howard v. United States, 948 N.E.2d 1179 (Ind. 2011), there was no controlling Indiana precedent on the question certified, see Howard v. United States, 100 Fed. Cl. 230, 235 (2011), certified question accepted, 948 N.E.2d at 1179, certified question answered, 964 N.E.2d 779 (Ind. 2012). This case "stands on a quite different footing" because

---

Minn. Mining Co. v. Nat'l Mining Co., 70 U.S. 332, 334 (1865); accord Arizona v. California, 460 U.S. 605, 620 (1983) ("Our reports are replete with reaffirmations that questions affecting titles to land, once decided, should no longer be considered open"), decision supplemented, 466 U.S. 144 (1984).

the Indiana Supreme Court has previously construed the PIRC's legislative charter and the Richmond release, leaving "no doubt as to the proper application of the state's law to the[] facts" of this case.  Toews v. United States, 376 F.3d 1371, 1381 (Fed. Cir. 2004).  "Furthermore, courts have a duty to decide the cases before them whenever it reasonably can be done.  Basic fairness, avoidance of unwarranted delay and the imposition of additional costs on the parties, and conservation of judicial resources, all dictate that" courts should decide cases when they can do so "on the law . . . ."  Id.; cf. Lehman Bros. v. Schein, 416 U.S. 386, 390-91 (1974) (remarking that while certifying questions to a state court when state law is in doubt "save[s] time, energy, and resources and helps build a cooperative judicial federalism," the decision to use a state's certification procedure "in a given case rests in the sound discretion of the federal court").  The court can and will rule on the parties' cross-motions for summary judgment on the law.[18]

### III. CONCLUSION

For the reasons set forth above, the court **DENIES** plaintiffs' motion for summary judgment and, with respect to the claims of the Group 2 plaintiffs premised on the releases addressed in this decision, **GRANTS** defendant's cross-motion for summary judgment.  Thus, the following claims are dismissed with prejudice:

- Oldham:  4, 9, 10, 12, 15, 16, 19, 21, 24, 30, 32, and 33.

- Pressly:  2, 5, 8, 10, 11, 14, 17, 20, 21a, 21b, 24, 31a, 31b, 33, 37, 42, 43a, 43b, 43c, 43d, 45a, 45b, 45c, 45d, 46, 47, 49, 51, 52, 59, 60, 65(b), 67a, 67b, 71, 72 (the portion adjacent to the segment acquired by the PIRC via a release), 73, 75, 77, 82, 86, 90, 91, 96, 98, 100, 105, 107, 113, 114, 115, 119a, 119b, 121, 125, 126, 131, 135a, 135c, 136, 139, 142, 152, 154, 157, 164, 167a, 167b, 173, 177a, 177c, 178, 180, 183, 185, 186, 189, 190, 196, 197, 201, 202, 209a, 209b, 212, 223, 224, 225, 226, 228, 230, 232, 233, 236a,

---

[18] Although not binding on this court, one of the factors that the United States Court of Appeals for the Seventh Circuit considers when deciding whether to certify a question to a state court, including the Indiana Supreme Court, is whether the issue is one of broad significance or applies only to the particular facts of the case before it.  See, e.g., Harney v. Speedway SuperAmerica, LLC, 526 F.3d 1099, 1101 (7th Cir. 2008); Erie Ins. Grp. v. Sear Corp., 102 F.3d 889, 892 (7th Cir. 1996).  Plaintiffs contend that the construction of the releases at issue in this case has broad application because there are hundreds of miles of railroad rights of way acquired in Indiana via legislative charters that include provisions similar to those in the PIRC's legislative charter.  However, this case does not concern every railroad corridor, legislative charter, and release in Indiana.  Rather, it concerns only the railroad corridor acquired by the PIRC, between two cities that are less than eight-five miles apart, via releases, substantively similar to one previously construed by the Indiana Supreme Court, executed pursuant to a legislative charter approved before the enactment of Indiana's statute governing the incorporation of railroad companies.  In other words, the decision in this case will have no effect on conveyances accomplished under other legislative charters or later-enacted state statutes.

236b, 245, 254, 257, 266a, 266b, 273, 277, 279, 281, 286, 289, 296, 297, 301, 302, 303, and 307.

- <u>Bradley</u>:  11, 18, 20, 24, 27, 29, 34, 36, 37, and 38.

- <u>ATS Ford</u>:  1, 26, 28, 30, 31, 33, 36, 37, 41, 42, 43, 44, and 45.

The remainder of defendant's motion is **DENIED** without prejudice.

In addition, plaintiffs in each case shall, **no later than Tuesday, April 6, 2021**, file updated notices identifying the claims in each group, as follows:

- The notices should reflect any corrections that may need to be made in light of defendant's remarks in the footnotes in Exhibit 5 to its cross-motion for summary judgment.

- In <u>Oldham</u>, <u>Bradley</u>, and <u>ATS Ford</u>, the claims premised, at least in part, on conveyances other than the releases addressed in this decision should be included in the Group 3 table.  <u>See</u> <u>supra</u> section II.A.

- The notices shall not include tables setting forth the claims of the Group 2 plaintiffs.

- The notice in <u>Pressly</u> shall include a separate table for the surviving portion of claim 72 that includes the same information provided for the Group 1 plaintiffs.

Finally, **no later than Tuesday, April 6, 2021**, the parties shall file a joint status report suggesting a schedule for further proceedings with respect to <u>Pressly</u> claim 72 and the claims of the Group 3 plaintiffs.  The identical joint status report shall be filed in each case.

**IT IS SO ORDERED.**

<u>s/ Margaret M. Sweeney</u>
MARGARET M. SWEENEY
Senior Judge