# In the United States Court of Federal Claims

Nos. 18-1964L & 19-1375L
(Consolidated)
(Filed:  June 25, 2024)

```
*****************************************
ROBERT PRESSLY and JANE PRESSLY    *
et al.,                            *
                                   *
                Plaintiffs,        *
                                   *
v.                                 *
                                   *
THE UNITED STATES,                 *
                                   *
                Defendant.         *
*****************************************
```

Steven M. Wald, St. Louis, MO, for plaintiffs.

Samantha G. Peltz, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

Plaintiffs in this case own real property adjacent to a railroad corridor in Marion and Hamilton Counties, Indiana.  They contend that the United States, by authorizing the conversion of the railroad corridor into a recreational trail pursuant to the National Trails System Act ("Trails Act"), acquired their property by inverse condemnation and that they are due just compensation for the taking.  Before the court is defendant's motion for partial summary judgment on two property valuation issues.  As explained in more detail below, the court denies defendant's motion.

## I.  BACKGROUND

As explained in a prior ruling, on January 19, 1846, the Indiana General Assembly enacted an "Act to incorporate the Peru and Indianapolis Railroad Company."[1]  Pursuant to that legislative charter, the Peru and Indianapolis Railroad Company ("PIRC") was authorized to construct a railroad line within Indiana originating in the town of Peru, running through the towns of Kokomo and Noblesville, and terminating in Indianapolis.  The legislative charter provided that the railroad corridor was to be no more than eighty feet wide.

In accordance with its legislative charter, the PIRC acquired the portions of the railroad

---

[1]  The court makes no findings of fact in this opinion.

corridor at issue in this case.  A railroad line was constructed, and a railroad operated, in the corridor acquired by the PIRC.  Eventually, in 1995, the line was purchased by three Indiana municipalities:  the City of Fishers, the City of Noblesville, and Hamilton County.

In 2017, the municipalities advised the Surface Transportation Board ("Board") of their collective desire to invoke the Trails Act, 16 U.S.C. §§ 1241-1251, which, as amended, provides for the preservation of "established railroad rights-of-way for future reactivation of rail service" by authorizing the interim use of such rights-of-way as recreational and historical trails.  Id. § 1247(d).  The following year, they submitted three separate requests to the Board, each relating to a different segment of the railroad line, for the issuance of a Notice of Interim Trail Use or Abandonment ("NITU").  A NITU permits the discontinuation of rail service, the salvaging of track and materials, and, if an agreement regarding trail use is not reached, the abandonment of the line.  49 C.F.R. § 1152.29(d)(1).  The Board issued the three NITUs on December 21, 2018, and the municipalities executed trail-use agreements in 2019.  The trail sponsors are Indiana municipalities.

After the Board issued the NITUs, a number of suits were filed in this court in which owners of parcels adjacent to the railroad corridor alleged that through the operation of the Trails Act and the issuance of the NITUs, defendant took their property without paying just compensation in violation of the Fifth Amendment.[2]  Regarding nine plaintiffs in this case, the liability of the United States has been established and the parties completed discovery relevant to just compensation.  The court suggested that all valuation issues regarding the properties of these nine plaintiffs be reserved for trial.

Defendant nonetheless moves for partial summary judgment on two issues.  The first concerns one plaintiff, Gallagher Real Estate, LLC ("Mr. Gallagher"), who asserts Claim 109ab in this case.  At issue is whether Mr. Gallagher suffered any loss of access to his property, because the trail easement after the NITU burdens all of his street frontage at the only point where he can enter and exit the property.  There is an existing driveway that crosses the trail easement and his glass business relies on that driveway.

The second issue presented in defendant's motion concerns three plaintiffs:  Hotel Alpha Tango, LLC (Claim 295), Monon Partners, LLC (Claim 198ab), and Urban Core Associates, LLC (Claim 280) (collectively, "the landowners").  Defendant asserts that the landowners are not entitled to any compensation for the costs of erecting fences to separate their properties from the trail because an Indiana statute requires the trail sponsor to provide fencing upon request by the impacted landowner.

Defendant's motion for partial summary judgment is fully briefed.  The parties did not request oral argument.  Thus, defendant's motion is ripe for adjudication.

---

[2]  The court issued a prior summary judgment decision in this case on March 23, 2021, and reissued a corrected decision on December 3, 2021, nunc pro tunc to March 23, 2021.  See Pressly v. United States, 156 Fed. Cl. 138 (2021).  The court issued a second summary judgment ruling in this case on April 1, 2022.  See Pressly v. United States, 159 Fed. Cl. 159 (2022).

## II.  STANDARD OF REVIEW

Defendant moves for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").  Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to a judgment as a matter of law.  RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if it "may reasonably be resolved in favor of either party."  Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine dispute of material fact.  Celotex, 477 U.S. at 323.  The nonmoving party then bears the burden of showing that there are genuine disputes of material fact for trial.  Id. at 324.  Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

However, in certain circumstances, even if the standard for summary judgment has been met, the court has the discretion to deny summary judgment when a full trial record would permit a more thorough and more accurate examination of the issue presented:

> The trial court has the right to exercise its discretion to deny a motion for summary judgment, even if it determines that a party is entitled to it if in the court's opinion, the case would benefit from a full hearing.

SunTiger, Inc. v. Sci. Rsch. Funding Grp., 189 F.3d 1327, 1333 (Fed. Cir. 1999) (quoting 12 James W. Moore, Moore's Federal Practice, § 56.41[3][d] (3d ed.1999)); see also Grounds for Summary Judgment—Judicial Discretion in Deciding a Rule 56 Motion, 10A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2728 (4th ed. 2016) ("[A]n appraisal of the legal issues may lead a court to exercise its discretion and deny summary judgment in order to obtain the fuller factual foundation afforded by a plenary trial.").

## III.  DISCUSSION

The court begins with a general review of binding precedent relevant to determining just compensation for a physical taking of property.  The Fifth Amendment to the United States Constitution prohibits the federal government from taking private property for public use without

paying just compensation.  U.S. Const. amend. V.  The landowner "is entitled to be put in as good a position pecuniarily as if his property had not been taken.  He must be made whole but is not entitled to more."  Olson v. United States, 292 U.S. 246, 255 (1934).  The focus is on the loss suffered by the landowner, not on the benefit received by the government.  Bos. Chamber of Com. v. City of Bos., 217 U.S. 189, 195 (1910) (holding that just compensation is for what the owner has lost, not for what the taker has gained).

For partial takings, the measure of just compensation is the difference between the value of the entire parcel in the "before" condition and the value of the remainder parcel in the "after" condition.  See, e.g., United States v. Miller, 317 U.S. 369, 376 (1943) (explaining that severance damages compensate the landowner for "any element of value arising out of the relation of the part taken to the entire tract"); Georgia-Pac. Corp. v. United States, 640 F.2d 328, 336 & n.4 (Ct. Cl. 1980) ("[In] the standard 'before and after' evaluation approach . . . severance damage is arrived at by first determining the value of the entire property before the taking and then subtracting therefrom the value determined to be applicable to the property remaining after the taking.  The difference, taking into account the value of the land taken, represents the diminution of value in the remainder property if this total is less than the value of the entire property before the take.").  Thus, in partial takings, both the value of the property taken and any distinct decrease in the value of the remainder parcel may contribute to the award of just compensation.  See, e.g., United States v. Grizzard, 219 U.S. 180, 185-86 (1911) ("To say that such an owner would be compensated by paying him only for the narrow strip actually appropriated, and leaving out of consideration the depreciation to the remaining land by the manner in which the part was taken, and the use to which it was put, would be a travesty upon justice.").  "[T]he burden of proof rests on [the] plaintiff to establish depreciation of the value of the remaining property because of the partial taking."  Georgia-Pac. Corp., 640 F.2d at 337.

The court turns now to the two property valuation issues presented by defendant's motion.

## A.  Crossing Rights for the Gallagher Property

Defendant argues that because Mr. Gallagher had a right to cross the railroad easement, he now has a right to cross the trail easement, and any claim for severance damages based on changes to the property's ingress and egress after the NITU is foreclosed by Indiana law.  See Def.'s Mot. 1 ("[T]his Court should conclude that access to the Gallagher property is not impeded by the issuance of the NITU.").  Plaintiffs attack this conclusion on two fronts.  First, they argue that Mr. Gallagher's crossing rights are uncertain:

> To firmly establish crossing rights and access, the owner of the Gallagher property would have to either reach an agreement with the trail operator or sue the trail operator to establish an easement, either by prior use, necessity, or prescription, all against which the trail operator would be able to argue . . . .

Pls.' Resp. 24.  Second, they argue that the market perception of Mr. Gallagher's crossing rights, as an influence on the property's valuation, is a genuine issue of material fact that should be resolved at trial, not on summary judgment.  See id. at 28 ("[A] risk to a Plaintiff's access, and a

potential buyer's assessment of that access, as enjoyed prior to the Trails Act's operation, even if that risk is a more restricted version of access, is a fact issue for an expert appraiser's analysis."). The court agrees with plaintiffs that defendant is not entitled to summary judgment on Mr. Gallagher's crossing rights, and explains its reasoning below.  In the alternative, the court would, in its discretion, deny defendant's motion because the issue presented would be more amenable to resolution once the parties' evidence has been considered at a valuation trial.

### 1.  Indiana Law

According to defendant, Mr. Gallagher's crossing rights are enshrined in statute.  The relevant statute reads:

> Owners of tracts of land separated by the right of way of a railway company, or owner of a tract or tracts of land separated by the right of way of a railway company from a public highway or road, lying and situated immediately contiguous to and adjoining said right of way, may, if such right of way has been or shall hereafter be acquired by condemnation and appropriation, or by purchase or donation, construct and maintain wagon and driveways over and across such right of way leading from one of such tracts to another on the opposite side of such right of way, or leading from such tract or tracts of land on one (1) side to the highway on the other side of the right of way, at any point most convenient to such owner.

Ind. Code § 8-6-14-1 (2024).  The most recent case referenced by defendant, for an example of how an Indiana court interprets this statute applicable to crossings rights, is a decision issued in 1911.  Def.'s Mot. 12 (citing Indianapolis S. R. Co. v. Wycoff, 95 N.E. 442, 444 (Ind. App. 1911)).  The 1911 case is not a case about a landowner's right to cross a trail easement established by a NITU under the Trails Act.  The statute and the Wycoff case do not establish that Mr. Gallagher has crossing rights over the trail easement.

Defendant also turns to more recent authority to argue that Mr. Gallagher has crossing rights over the trail easement.  Defendant states that "[u]nder Indiana law, ingress and egress is clearly compatible with a recreational trail-use easement."  Def.'s Reply 5 (citing Drees Co. v. Thompson, 868 N.E.2d 32, 43 (Ind. Ct. App. 2007)).  The Drees case, however, does not concern a former railroad easement converted to a trail easement, but a developer's proposed recreational trail that was alleged to interfere with the reasonable use of an access easement benefiting a landlocked property surrounded by the developer's proposed subdivision.  Drees, 868 N.E.2d at 36-37.  Because Drees addressed the scope of the landowner's access easement in a real estate development context, it has little or no relevance to Mr. Gallagher's rights to cross the trail easement at issue in this case.

Defendant also suggests that Mr. Gallagher's crossing rights are established by the trail use agreement.  Def.'s Mot. 11 n.6 (citing Def.'s Mot. Ex. 1 at 10).  Defendant reads one provision of the agreement to ensure that Mr. Gallagher has the same crossing rights over the trail easement as he had over the railroad easement.  See id. ("Because the rights of the owners of the rail corridor were limited by Indiana law providing for Gallagher's crossing, the trail

-5-

sponsor's rights are similarly limited by the trail use agreement, in addition to the statute."). Defendant also emphasizes that the trail sponsor assumes "responsibility for maintaining all road crossings, public or private." Id. at 13 n.8 (citing Def.'s Mot. Ex. 1 at 11). The relevant provision of the trail agreement states that:

> Trail Sponsor hereby assumes all duties and obligations . . . with respect to existing (identified at the time of execution or thereafter) or future private crossing agreements on and over the [trail]. Trail Sponsor may remove any private crossings where such removal is not prohibited by contract or by law.

Def.'s Mot. Ex. 1 at 11. One key question for an interpretation of this provision in the trail agreement is whether Mr. Gallagher benefited from an "existing . . . private crossing agreement[]" to cross the railroad easement. Id.

The parties have different answers to this question. They even appear to disagree as to how the court should analyze the question. While both parties look to Indiana common law, plaintiffs also look to the special circumstances of Mr. Gallagher, who paid a number of lease payments to the railroad's successor-in-interest in return for "the occupation and use of certain land [within the railroad corridor] for the purpose of maintaining and using a fence encroachment and driveway." Pl.'s Resp. Ex. 7 at 2. Plaintiffs view this lease agreement as proof that Mr. Gallagher's crossing rights were dependent on the lease, and further contend that his crossing rights were later extinguished by the terms of the lease.

Aside from their reliance on the terms of the lease, plaintiffs discuss the varieties of easements that might be viewed as the embodiment of crossing rights that could have been conveyed to Mr. Gallagher. These include an "easement by prior use," an "easement by necessity," and a "prescriptive easement." Pls.' Resp. 24-27. Plaintiffs painstakingly review the elements required to convince an Indiana court that any such crossing rights easement exists. Plaintiffs conclude that the proof of the elements required for such easements would either be impossible, uncertain, or, at the very least, costly. See id. at 27 (concluding that "a reasonable buyer would not assume access when presented with the likelihood of a lawsuit to establish those rights"). The court agrees with plaintiffs that litigation to establish a heretofore-unrecorded crossing rights easement would be costly and that the prospect of litigation would depress the value of Mr. Gallagher's property.

Defendant argues, however, that under Indiana common law plaintiffs' concerns about Mr. Gallagher's crossing rights are unwarranted. According to defendant,

> Indiana common law supports [Mr.] Gallagher's ability to access [his] property in at least two ways. First, it is an "ancient maxim" under Indiana state law "that a grantor cannot convey that which he does not own." Downing v. Eubanks, 557 N.E.2d 1027, 1029-1030 (Ind. Ct. App. 1990). Because the railroad only held a right-of-way subject to crossing rights, it could only convey a right-of-way subject to crossing rights. Second, in Indiana, "[i]t is well established that easements are limited to the purpose for which they are granted . . . [and] the dominant estate cannot subject the servient estate to extra burdens . . . ." Kwolek

v. Swickard, 944 N.E.2d 564, 571 (Ind. Ct. App. 2011) (citations and quotations omitted).  There is no evidence that access over the corridor is incompatible with the purpose of a recreational trail, particularly given that [Mr.] Gallagher had and exercised this right while the railroad corridor was still present.  And interfering with such ingress and egress would improperly burden the servient estate, here, the Gallagher property.  Thus, Indiana common law clearly confers [Mr.] Gallagher the right to enter and exit across the trail.

Def.'s Mot. 12-13 (all alterations except [Mr.] and [his] in original) (footnotes omitted). Defendant's interpretation of Indiana common law raises more questions than it answers.  Was the creation of the trail easement a conveyance by the owner of the railroad easement, so that the ancient maxim of Indiana common law referred to in Downing applies?  And even if the creation of the trail easement could be viewed as a conveyance, how would an Indiana court weigh the propriety of any burdens the trail sponsor might impose on Mr. Gallagher's crossing rights, assuming that those rights ran with the land under Indiana common law?

In its reply brief, defendant declines to substantively address plaintiffs' contentions regarding the types of easements that could be litigated in Indiana state court to assert Mr. Gallagher's crossing rights.  Def.'s Reply 3 n.2.  However, the difficulty and expense of establishing such easements in state court proceedings is a legitimate concern, and this issue was raised in one of the cases referenced by defendant in its opening brief.  See Dana R. Hodges Tr. v. United States, 111 Fed. Cl. 452, 458-59 (2013).  Defendant also references authority commenting on the nature of the conversion of a railroad easement to a trail easement.  For example, defendant points to Preseault v. United States, 100 F.3d 1525 (Fed. Cir. 1996) (en banc).  However, one of the statements in that decision implies that a trail easement is better described as a new easement, not a conveyance of an old railroad easement to the trail sponsor: "The taking of possession of the lands owned by the [landowners] for use as a public trail was in effect a taking of a new easement for that new use, for which the landowners are entitled to compensation."  Preseault, 100 F.3d at 1550.  The court is not convinced that defendant has shown that Mr. Gallagher now possesses the same crossing rights, under Indiana common law, as he possessed before the NITU issued.

Having considered the parties' arguments concerning Indiana statutory and common law, and the terms of the trail agreement, the court is not willing to conclude, as defendant suggests, that "the after condition for valuation purposes cannot presume or include the loss of such crossing rights and [that Mr.] Gallagher is not entitled to additional just compensation based on a loss of access as a matter of law."  Def.'s Mot. 13.

## 2.  This Court's Decisions on Crossing Rights

Defendant also looks to decisions of this court in other rails-to-trails cases for support for its arguments regarding crossing rights.  In reviewing these opinions, the court is mindful that these decisions are persuasive, not binding, precedent.  See, e.g., W. Coast Gen. Corp. v. Dalton, 39 F.3d 312, 315 (Fed. Cir. 1994) (stating that decisions of the United States "Court of Federal Claims . . . , while persuasive, do not set binding precedent for separate and distinct cases in that court").  The court is also mindful that it is Mr. Gallagher's crossing rights under Indiana law,

not the law of other states, that must be considered in the court's upcoming valuation trial.  See Preseault v. I.C.C., 494 U.S. 1, 8 (1990) ("State law generally governs the disposition of reversionary interests" such as rail corridor easements in rails-to-trails cases.); Preseault, 100 F.3d at 1534 (same).  Finally, the court notes that decisions issued after a trial has been held, rather than those deciding motions for summary judgment, are applying a different standard of review.[3]  The fact that defendant relies on post-trial decisions indicates that crossing rights may be appropriately addressed on a full trial record examining competing appraisals of the properties in their "before" and "after" conditions.

The court focuses on two decisions that defendant accords special significance.  The first is Hodges.  According to defendant, this case stands for the proposition that the "Court of Federal Claims has repeatedly held that the operation of the Trails Act does not impact 'established, but unrecorded crossings.'"  Def.'s Mot. 9 (quoting Hodges, 111 Fed. Cl. at 457). Defendant argues that in Hodges "the court concluded that the Trails Act did not impact crossing rights; instead, the applicable state law controlled and dictated the property interests" of the landowners.  Id. at 10 (citing Hodges, 111 Fed. Cl. at 456-58).

The court's holding in Hodges relevant to the motion currently before the court is more nuanced than defendant's contention may presume.  It would be fair to say that the court rejected the plaintiffs' argument that the trail easement entirely eliminated their crossing rights, and their contention that the portions of their parcels severed by the rail corridor were now valueless, as if these acres had been taken in fee.  See Hodges, 111 Fed. Cl. at 457 ("Plaintiffs here are no-wise impeded from exercising whatever rights of access they held that pre-existed the conversion of the railroad corridor to recreational usage.").  Further, for existing but unrecorded crossings, the court held that "it is not the case that the Trails Act per se has impaired Plaintiffs' rights to any greater extent."  Id. at 458.

However, the court noted the difficulties the plaintiffs might face in asserting their crossing rights, and the diminution in market value that would accompany an expectation that the plaintiffs' crossing rights could only be asserted through litigation in state court.  Id. at 458-49. The court concluded that "if the limitations on any crossing rights to which the various Plaintiffs may be entitled by operation of state property law diminish the highest and best use of their lands, compared to what would be the case if the parcels were not bifurcated by virtue of the recreational trail, then such diminished value ought to be reflected in the parcels' appraisals in the 'after' condition."  Id. at 459.  It is important to note, too, that this court in Hodges considered crossing rights under Michigan law, not Indiana law.  Id. at 458.

The other decision upon which defendant primarily relies is Schulenburg v. United States, 139 Fed. Cl. 716 (2018).  Def.'s Mot. 10; Def.'s Reply 5, 7-8.  Here the stars are better

---

[3]  The post-trial decisions referenced by defendant in its opening brief include Olson and Sears v. United States, 132 Fed. Cl. 6 (2017), aff'd without opinion, 726 F. App'x 823 (Fed. Cir. 2018).  In its reply brief, defendant also relies on Moore v. United States, 61 Fed. Cl. 73 (2004), a post-trial decision referenced by plaintiffs, and Fordyce v. United States, 7 Cl. Ct. 591 (1985), a post-trial decision not referenced by plaintiffs.  Def.'s Reply 7-8.

aligned for defendant:  this court considered crossing rights under Indiana law, on cross-motions for summary judgment, in a rails-to-trails case.  Defendant accurately summarizes two holdings in Schulenburg—the crossing rights that existed over the railroad easement survived the conversion of the railroad to a recreational trail, and these crossing rights ran with the land to successive owners of the property abutting the trail.  See Schulenburg, 139 Fed. Cl. at 719 ("The Court concludes that crossing rights are well established under Indiana law, and that these rights run with the land.").  The guidance defendant distills from the court's holdings in Schulenburg is problematic, however, for this case.

First, relying on Schulenburg and other rails-to-trails decisions of this court, defendant states that Mr. "Gallagher had legal access to [his] property before the NITU under Indiana law and retains legal access today."  Def.'s Reply 5.  There are significant differences between the issue before the court in Schulenburg and the issue presented in defendant's motion, however.  The parcel at issue in Schulenburg was bisected by the trail, leaving 55 acres of farmland inaccessible other than by a crossing over the trail, and the particular characteristics of that parcel, and the crossing point, were addressed by the court in its analysis.  See 139 Fed. Cl. at 718, 720 (noting that the subject parcel was farmland "property situated on both sides of a crossing that remains in use," "the crossing identified on the maps filed by the United States ha[d] been in place since at least 1916," and a prior owner of the parcel had waived "damages [caused by] the Railroad's digging up and removing about four acres of dirt").  Here, in contrast, Mr. Gallagher's property is not bisected, it is burdened along one edge; his small parcel is in a densely developed area; further, he and a prior owner paid monthly sums to the railroad, or the railroad's successor-in-interest, pursuant to a lease that mentions his driveway.  These were not the facts before the court in Schulenburg; the analysis of Indiana property law in that case was not applied to Mr. Gallagher's parcel and Schulenburg is not conclusive as to his crossing rights.

Second, defendant relies on Schulenburg and other authority for two related conclusions that the court must reject at this stage of the proceedings.  Defendant contends that "there are no limitations on [Mr.] Gallagher's crossing rights, so there is nothing relevant to valuation," and Mr. "Gallagher's claim for access damages is, thus, foreclosed."  Def.'s Reply 7-8.  The court in Schulenburg repeatedly emphasized that a "before" and "after" valuation of the subject parcel was not part of the analysis requested by the parties on summary judgment.  139 Fed. Cl. at 718 & n.1, 721.  Indeed, the court referenced the Hodges decision to acknowledge that an "after" valuation could reflect the decreased value of a parcel that now had limitations on crossing rights, compared to the same property in the "before" condition.  Id. at 721.  Here, plaintiffs point to deposition testimony that a prior owner, the one who sold the property to Mr. Gallagher, had difficulty selling the property because of the uncertainty of the ingress/egress rights of the property.  According to plaintiffs, Mr. Gallagher overcame his own concerns about crossing rights "based on assurances from [the prior owner] regarding the terms of the [lease], but he was aware of underlying issues with permanent access."  Pls.' Resp. 13.  Defendant's reliance on Schulenburg for guidance as to the valuation of Mr. Gallagher's property in the "after" condition is unwarranted.[4]

_____

[4]  The Schulenburg case was in a significantly different procedural posture when the court issued its summary judgment ruling in favor of the government's position on crossing rights.  The parties had tentatively settled just compensation amounts for every parcel except for

Having reviewed all of the rails-to-trails cases referenced by defendant, the court cannot conclude, at this pretrial stage of the proceedings, that Mr. Gallagher's crossing rights in the "after" condition are such that he is precluded from receiving just compensation for a loss of those crossing rights, or a limitation on those crossing rights, as a matter of law.

### 3. Genuine Dispute of Material Fact

The question for the court in a valuation trial will be to determine the "before" value of the property, where Mr. Gallagher is considered to have owned, unburdened by any easement, property with frontage on South Street at the time of the NITU, and the "after" value of the property, where his sole access to South Street, or any street, for that matter, would be determined by his crossing rights, if any, over the trail easement, at the time of the NITU. Just compensation would be difference in the value of the "before" and "after" properties.

Plaintiffs argue that the "after" value would take into consideration any uncertainty regarding Mr. Gallagher's crossing rights, any litigation costs that might be expended to assert his crossing rights, and any market perception as to the disadvantages of a trail easement burdening the entirety of his property's frontage along the street. Plaintiffs also point out that it is not the existing use of the property that would be used in the "before" and "after" valuations, but the highest and best use of the property. In their view, the market would consider the potential for conflicts between the trail sponsor and Mr. Gallagher, or his successor, as both the trail and the property evolve. Plaintiffs have pointed to deposition testimony and documentary evidence in support of their arguments. Plaintiffs' appraiser found that the property's value was primarily based on its potential combination with an abutting property on South Street that had unencumbered access to the street, and that the lack of crossing rights resulted in an $869,000 decrease in the value of the property in the "after" condition. Pls.' Resp. Ex. 5 at 6.

Defendant largely relies on its interpretation of Indiana property law, and of the trail agreement, to conclude that Mr. Gallagher cannot receive any compensation for the loss, or the limitation, of his crossing rights in the "after" condition. Defendant also specifically references Mr. Gallagher's deposition testimony that appears to provide a cost estimate for the legal services that would be required to establish that the property has crossing rights over the trail easement. Defendant argues that this testimony shows that Mr. Gallagher's and plaintiffs' appraiser's "subjective beliefs" regarding the property's lack of crossing rights are unfounded. Def.'s Reply 6-7. Defendant concludes that:

> There is no genuine dispute as to any material fact. [Mr.] Gallagher has legal access to [his] property. Plaintiffs have produced no evidence that [Mr.] Gallagher has been denied access to [his] property. Plaintiffs have failed to point to any evidence supporting a reasonable probability that the market value of the

---

the farm with the crossing rights issue. Schulenburg, 139 Fed. Cl. at 717-19. The parties asked the court for assistance on that issue so they could bring settlement negotiations to a conclusion. Id. at 717-18. Here, the parties are not settling the claims of these nine plaintiffs but preparing for a valuation trial to determine just compensation for these plaintiffs.

property would reflect the loss of legal access. In fact, the constructed trail does not physically intersect with [Mr.] Gallagher's driveway. No person looking at the property would reasonably believe the property does not have legal access— and, of course, it does.

Id. at 8 (citing Def.'s Reply Ex. 2).

Having considered the arguments of the parties, the court agrees with plaintiffs that there is a genuine dispute of material fact as to the limitations on Mr. Gallagher's access to his property in the "after" condition, and that this issue would be a focus in a valuation trial and a factor in determining the just compensation for the taking of the trail easement. Defendant has not shown that its position on this issue is correct as a matter of law, or that there is no genuine dispute of material fact.

### 4. Trial of the Crossing Rights Issue

Finally, the court finds that the access component of just compensation for Mr. Gallagher would be more efficiently and more accurately determined after the court considers trial evidence establishing the "before" and "after" value of his property. Even if the court believed that defendant satisfied the summary judgment standard, which it does not, in the court's experience it makes more sense in rails-to-trails cases such as this one to consider all of the key components of property valuation, together, once the richer context of trial evidence is available. The court's belief is strengthened by the fact that this matter is about to be assigned to a new judge for further proceedings. The new judge would not be bound by any summary judgment ruling granting defendant's motion, and would, in consequence, be forced to revisit the same crossing rights issue at a valuation trial. See Exxon Corp. v. United States, 931 F.2d 874, 878 (Fed. Cir. 1991) ("To the extent that a trial judge can alter a previous ruling, so too can a successor judge[.]"). In these circumstances, it would be inefficient to rule in defendant's favor, even if the court were convinced that defendant was entitled to summary judgment.

### B. Just Compensation for Fencing Required for Three Properties Abutting the Trail

At a valuation trial, the court would consider whether the cost of fencing in the "after" condition is an appropriate type of severance damages for the landowners. Severance damages are available "[i]n circumstances where there is a partial taking of property, [because] just compensation is mandated for any depreciation in value of the remaining property not taken which is occasioned by the partial taking." Georgia-Pac. Corp., 640 F.2d at 336. According to defendant, no severance damages should be included for these plaintiffs because fencing will be provided by the trail sponsor pursuant to an Indiana statute.

Only in very narrow circumstances, however, does precedent allow for deductions from the just compensation otherwise due a landowner who has suffered a taking. If, for example, immature crops are destroyed by the government, the costs of bringing those crops to maturity and to market are deducted from the commercial value of those same crops in a mature state to arrive at just compensation. See, e.g., Daily v. United States, 90 F. Supp. 699, 701-02 (Ct. Cl. 1950) ("Because plaintiffs were not required to carry their crop to ultimate harvest, certain

-11-

expenses incident thereto were not incurred and hence are to be deducted from the gross amount found to be due then at harvest time."). A court may also deduct the special benefits a government project brings to a remainder parcel in its determination of just compensation for a taking. See, e.g., Ideker Farms, Inc. v. United States, 71 F.4th 964, 985 (Fed. Cir. 2023) ("[I]f governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty." (quoting United States v. Sponenbarger, 308 U.S. 256, 266-67 (1939))); Hendler v. United States, 175 F.3d 1374, 1383 (Fed. Cir. 1999) (affirming the trial court's ruling that the special benefits of a government project "completely offset[] even [the] plaintiffs' valuation of the easements taken").

Defendant, however, relies on the trail sponsor, pursuant to the Indiana statute, to make the landowners whole for the fencing required in the "after" condition of their properties. Defendant assumes that fencing will be provided by the trail sponsor, that no depreciation in value in the "after" condition of the properties can be attributed to fencing requirements, and concludes that the landowners cannot receive compensation for fencing. See Def.'s Mot. 14 (asserting that "just compensation for a net loss of zero is zero" (quoting Brown v. Legal Found. of Wash., 538 U.S. 216, 240 n.11 (2003))).

One question raised by the parties' arguments is whether defendant's reliance on the trail sponsor's duty to erect and maintain fencing is permissible under binding precedent. Another question is whether, as a matter of fact, the trail sponsor's fencing would be equivalent to the fencing the landowners could obtain through spending the severance damages awarded to them by this court as just compensation. The final question is whether the parties' dispute would be more efficiently and accurately resolved after a valuation trial, rather than through the resolution of defendant's motion for partial summary judgment.

### 1. Zero Severance Damages Because the Trail Sponsor Will Fence the Trail?

Defendant argues that the court should "conclude that Plaintiffs are not entitled to the costs of installing and maintaining fencing as part of just compensation." Def.'s Mot. 2. Defendant bases this proposition on an Indiana law that states, in relevant part, that a trail sponsor (referred to as the "responsible party") shall, "[a]t the request of a property owner,"

> [e]rect and maintain fencing between the recreational trail and the property owner's property. The fencing must be in accordance with current fencing standards of the Indiana department of transportation for urban or rural settings, as appropriate to the location of the recreational trail.

Id. at 6-7 (quoting Ind. Code § 8-4.5-6-6 (2024)). Defendant also relies on an unreported decision of a state court in Indiana, Courtright v. Indiana Trails Fund Inc., CAUSE No. 47C01 1411 PL 001766 (Ind. Monroe Cir. Ct. IV Nov. 30, 2015), where a landowner was able to obtain a court order directing the trail sponsor to comply with the statute and build a fence along the landowner's property abutting a trail. Def.'s Mot. Ex. 3. Defendant further relies on Olson and similar precedent for the proposition that a property owner, after a partial taking, should not receive a windfall or a double recovery in an award of just compensation. Finally, defendant

compares the fencing issue before the court to a crossing rights issue considered by this court in Sears, where the court found that the "plaintiffs [should] not be awarded . . . maintenance costs related to access . . . [because] Iowa Code §§ 327G.11 and 327G.81 explicitly impose those responsibilities and costs on the trail operator." Def.'s Mot. 15 (all alterations except the first in original) (quoting 132 Fed. Cl. at 27). Defendant suggests that the court should follow the reasoning in Sears and hold that the landowners "are not entitled to compensation from the United States for the costs of fencing because Indiana law imposes that responsibility on the trail sponsor and [the landowners] are able to enforce that law against the trail sponsor." Id.

The court need not examine every argument that plaintiffs muster against this conclusion, for two reasons.[5] First, plaintiffs have identified a genuine dispute of material fact as to the fencing requirements for these properties, as discussed in the next section of this opinion. Second, there is a dearth of persuasive caselaw to support defendant's contention that the landowners' ability "to enforce [Indiana state] law against the trail sponsor," id., is, as a matter of law, an adequate substitute for severance damages that might be substantiated by expert testimony at trial.

The legal conclusion that defendant urges the court to adopt depends to a great extent on whether Sears is persuasive authority that supports defendant's view of takings law. The court in Sears applied relevant takings jurisprudence to determine the value of the trail easements taken by the United States as well as the amount of severance damages due the plaintiffs. 132 Fed. Cl. at 10-25. The court's recitation of takings law and precedent binding on this court is impeccable. Id. at 10-12. In discussing trail crossings and access to the plaintiffs' land, however, once the court had disposed of a federal-state preemption issue, the court's only references are to Iowa property law and witness testimony. Id. at 25-27. Thus, for the dispute as to severance damages for the landowners' crossing rights and crossing maintenance costs, the ruling in Sears appears to based almost entirely on the court's understanding of Iowa law and on the testimony of witnesses regarding the trail sponsor's maintenance obligations and practices. The court believes that the holding in Sears regarding the availability of a remedy under state law is largely limited to the facts of that case:

> If the trail operators are not following these policies and are failing to control weeds and maintain the crossings, the United States is not liable for any resulting damage or costs to [the] plaintiffs' property because these are exclusively matters of state law. Rather, plaintiffs may enforce Iowa Code §§ 327G.11 and 327G.81 against the local trail operators, not the United States, in Iowa state court.

132 Fed. Cl. at 27.

If the court in Sears considered severance damages, as a general rule, to be foreclosed by a state law cause of action whenever a detriment to a remainder parcel could be addressed in that

---

[5] The court acknowledges plaintiffs' invitation to apply equitable doctrines established in tort cases to the takings context and but respectfully declines to do so. See Pls.' Resp. 19 (stating that "a wrongdoer, in this case the United States[,] having taken Plaintiffs' land without compensation, should bear the consequences of [its] actions").

fashion, the topic is not addressed in its post-trial opinion. The court notes, too, that <u>Sears</u> is not authority binding on this court, even if that opinion's author had explicitly addressed this issue and had interpreted binding precedent to come to such a conclusion. Further, the court has not identified any authority for the proposition that a state law cause of action should be substituted for severance damages, other than the passage in <u>Sears</u> relied upon by defendant.

There are sufficient reasons to distinguish <u>Sears</u> from the subject matter, as well. The court in <u>Sears</u> had the benefit of trial testimony to determine whether severance damages related to crossing rights and crossing maintenance had been proved. This court has no such evidentiary record. The court in <u>Sears</u> examined trail crossings, not trail fences. In this case, a different factual record would be developed and then considered by the trial court to determine the need for various types of fencing, unlike the record in <u>Sears</u> which established the availability of crossings and the responsibility for the maintenance of those crossings. <u>See</u> 132 Fed. Cl. at 25-27 (weighing extensive trial testimony that established that the crossings were being used by the landowners, that the trail sponsor was permitting such crossings, and that the trail sponsor was maintaining those crossings). Finally, the court in <u>Sears</u> interpreted Iowa law, whereas defendant invites this court to interpret Indiana law.

For all of the above reasons, defendant has not established that, as a matter of law, the landowners' right to press a state law cause of action addressing the fencing obligations of the trail sponsor is an adequate substitute for severance damages related to the fencing requirements for the landowners' properties in the "after" condition.

## 2. Equivalence of Trail Sponsor's Fence and Landowners' Fencing Requirements?

Assuming, for hypothetical purposes, that the trail sponsor would erect and maintain fencing separating the landowners' properties from the trail, would this fencing be equivalent to the fencing requirements identified by plaintiffs' appraiser? According to plaintiffs, their appraiser determined that a six-foot galvanized fence with "rails and barbed wire [costs] $21.74 per linear foot," and opined that the fencing costs for the landowners would range from $5500 to $14,200, depending on the size of the parcel. Pls.' Resp. 5-8. The Indiana statute, according to defendant, imposes on the trail sponsor the duty to erect "fencing . . . in accordance with current fencing standards of the Indiana department of transportation for urban or rural settings, as appropriate to the location of the recreational trail." Ind. Code § 8-4.5-6-6.

Plaintiffs argue that the "fencing costs [issue is] replete with material questions of disputed facts, expert testimony is absolutely necessary, and therefore addressing the fencing statute and its impact on Plaintiff's just compensation is not appropriate for summary judgment." Pls.' Resp. 21. Defendant does not substantively respond to this argument other than to describe plaintiffs' concern with the uncertainty of the application of the Indiana statute as "speculative." Def.'s Reply 2. Defendant also reiterates its contention that awarding compensation for fencing costs would amount to a "windfall" and "double recovery" for the landowners. <u>Id.</u> at 11.

The court is persuaded that plaintiffs have identified a genuine dispute of material fact. Whether a trail sponsor's fence, assuming, hypothetically, that one would be provided, would meet the fencing requirements identified by plaintiffs is impossible to determine without further

development of the facts.  In the court's experience, different types of properties require different types of fencing to separate the properties from the trail.  See Hardy v. United States, 141 Fed. Cl. 1, 29 (2018) (crediting expert testimony regarding fencing costs because the appraiser "utilized the suitable type of fencing for each [property] scenario").  For ease of construction and maintenance, and perhaps for aesthetic reasons as well, a trail sponsor would likely prefer to have uniform fencing along the trail.  Whether a trail sponsor's fencing would fully, partially, or inadequately address the fencing requirements of the landowners' properties cannot be determined on the record before the court.  Further, even if fencing provided by the trail sponsor would adequately meet the landowners' fencing requirements in the "after" condition, the valuation of the property might need to be adjusted to reflect the transactional costs of obtaining a fence from the trail sponsor.  The fencing costs issue cannot be resolved on summary judgment given these genuine disputes of material fact.

### 3.  Suitability of Summary Judgment Proceedings for Fencing Costs Calculation?

Even if the court believed that defendant satisfied the summary judgment standard, which it does not, the court would, in its discretion, reserve the fencing costs issue for trial.  The court notes that defendant leverages its best arguments regarding fencing costs on post-trial rulings, such as Olson and Sears.  In the court's experience, the valuation of properties in the rails-to-trails context is fact-intensive and best reserved for trial, not summary judgment.

Neither party identified a property valuation decision issued by this court that resolved a claim for fencing costs at the summary judgment phase in the litigation of a rails-to-trails case.  Nor has the court identified any such authority.  Indeed, rather than grant summary judgment on fencing costs, one judge of this court deferred the fencing costs issue for "further factual development."  Anna F. Nordhus Fam. Tr. v. United States, 106 Fed. Cl. 289, 293-94 (2012).  In Hardy, the undersigned judge ruled on severance damages related to fencing after an eight-day valuation trial. 141 Fed. Cl. at 3.

In light of the parties' dispute over the valuation of the landowners' properties in the "after" condition, and given the imminent transfer of this case to another judge, the issue of fencing costs is more appropriately reserved for resolution at a valuation trial.  See supra Section III.A.4.  The trial would permit the court to thoroughly and accurately weigh evidence establishing the "before" and "after" value of the landowners' properties, and award just compensation accordingly.

## IV.  CONCLUSION

For the reasons set forth above, the court **DENIES** defendant's motion for partial summary judgment.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Senior Judge